757

F. M. WEBB, Respondent,

v.

Mary Joan WEBB, Executrix of the Estate of Robert M. Webb, Deceased, Appellant.

No. 56781.

Supreme Court of Missouri, Division No. 2.

Sept. 10, 1973.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Richard Boardman, St. Louis, Legal Aid Society of St. Louis, for appellant.

Coburn, Croft, Shepherd & Herzog, Peter W. Herzog, Jr., John R. McFarland, Kenneth R. Heineman, St. Louis, respondent, F. M. Webb.

Green & Lander, Martin M. Green, Edward Lander, Clayton, for appellant.

HOUSER, Commissioner.

F. M. Webb sued in equity for specific performance of an oral contract, alleging that by its terms plaintiff's son Robert (now deceased) and plaintiff agreed that Robert would repay plaintiff loans totaling $57,000 on demand, but if Robert died before repayment the estate of Robert would transfer to plaintiff certain shares of stock and notes bought with the $57,000 and the securities would be accepted by plaintiff in full payment of the loans. Other allegations included the death of Robert, the failure and refusal of the executrix of Robert's estate to transfer the securities to plaintiff, the peculiar value of the securities to plaintiff, and that the securities have no market value and are not easily obtainable. Executrix filed a general denial coupled with a specific denial that plaintiff had any right to the stock and a specific allegation that "there was no contract between the deceased and the plaintiff." The Statute of Frauds was not pleaded as a defense. Following a decree of specific performance executrix appealed.

The amount in controversy exceeds $30,000 and the notice of appeal having been filed prior to January 1, 1972, this Court has jurisdiction.

■ Our duty under Rule 73.01(d), V.A.M.R., is to review the case upon both the law and the evidence, not set the decree aside unless clearly erroneous, and give due regard to the opportunity of the trial chancellor to judge of the credibility of the witnesses. Biggs v. Moll, 463 S.W. 2d 881, 886 (Mo.1971). We accept plaintiff's suggestion that he had the burden to prove the existence and terms of the contract pleaded by clear, convincing and satisfactory evidence. Hackbarth v. Gibstine, 182 S.W.2d 113, 118 (Mo.App.1944); State ex rel. Place v. Bland, 353 Mo. 639, 183 S. W.2d 878, 888–889 (banc 1944).

The following facts are uncontroverted: Plaintiff, desiring to invest in Continental Bancshares Corporation on his own account and being willing to lend to his banker friend Richard E. Fister and to advance to his son Robert the necessary funds for them to make a similar investment, met with Robert and Fister on September 25, 1968 at which time each of the three men signed a separate subscription agreement for the purchase of 700 shares of stock in Continental plus $7,700 worth of its convertible notes, for $56,700, $5,000 down and $51,700 payable within 60 days. Plaintiff issued three $5,000 checks representing the deposit required on each of the subscription agreements. Plaintiff's personal check was made payable to Continental Bancshares. Another, marked "loan," was made payable to Fister. The third check was made payable to Robert. Later plaintiff issued checks to Robert and Fister to cover the balances due. Stock and notes were issued to the three men in their individual names pursuant to the subscription agreements. The certificates and notes issued in Robert's name were found in his effects at his death. They came into the possession of the executrix, who refused to transfer them to plaintiff.

At trial plaintiff offered to testify concerning the transaction but was not permitted to do so on the basis of the Dead Man's Statute.

Plaintiff produced as his only witness to the existence and content of the oral agreement Richard E. Fister who, over objection, was permitted to testify as follows: Fister and plaintiff agreed that the latter would lend Fister $56,700 for the purchase of these securities, and that Fister would either repay that sum to plaintiff or else the securities purchased with it were "really to be" plaintiff's; that if the loan was not repaid to plaintiff by the time of Fister's death the stock would "be his" (plaintiff's). On several occasions prior to September 25, 1968 plaintiff had told Fister that he would do the same thing for Robert that he was doing for Fister. On that date, at the first meeting between the three men, Fister told plaintiff that he appreciated the loan and the conditions under which it was made but Fister wanted plaintiff to understand that Fister intended to buy stock other than the 700 shares; that when during that conversation Fister told plaintiff that he so intended Robert "indicated that the same thing was true of him"; that Robert indicated "by speaking" that Robert's agreement with his father with respect to the stock was the same as Fister's agreement with the father; that Robert "seemed to mumble and nodded his head"; that while plaintiff was writing Robert's check Fister looked at Robert and Robert said "yes"; that "you have to know Bob Webb. * * * Bob never talked very much at all even when we had business transactions and so you had to pretty much get his understanding from his demeanor, if I may put it that way"; that Fister had no doubt in *his* mind as to Robert's understanding with his father that the stock would be his father's in the event Robert did not pay the loan before Robert's death. After purchase of the stock the three men, at Fister's office on October 18, 1968, began to discuss what would happen to their respective stock interests should one or the other die. "To the best of [Fister's] recollection Robert told Fister that he wanted his stock to be his father's and *that was his intent if he died without having repaid the loan*"; that there was some discussion about "placing on the stock certificate the right of survivorship in the event of death"; that "they" asked Fister about it because "they were concerned about seeing who received it," and Fister (a lawyer and financial advisor to plaintiff in years past) discussed "the possibility of putting something on the stock [?] or having a trust or something," but this was never done. After delivery of the stock plaintiff asked Fister to give him a note evidencing the debt, and Fister executed a note to plaintiff as requested. There is no evidence that Robert was ever requested by plaintiff to sign a note or that any note was signed by Robert. At the October 18 meeting Fister also suggested *that they could will the stock to each other.* Fister testified that at the meeting Robert "by his conversation and speech" told Fister that the stock was to be his father's in the event of his death, and that to the best of Fister's recollection Robert "stated" that he so desired, but when asked whether that was "the same consent elicited to [Fister] whether by groan or nod or through some other means of speech [as] on this occasion of October 18 * * *" Fister answered, "I felt it was a continuation of the same thing"; that it expressed the same thing to Fister that was expressed on October 18. Repeating, Fister testified that he "clearly described the conditions under which [Fister's] stock would go back to F. M. Webb"; that these conditions "were enunciated in front of" Robert and Robert "indicated by speech or otherwise his consent to these conditions," but Fister *did not recall whether Robert "said anything specific."* (Our emphasis throughout.) Pressed on the point Fister, asked whether Robert "made any noise to the effect that the same was true of him," replied, "Yes, sir, it was *my absolute understanding* that his agreement was the same as mine. This came about through

what proceeded [preceded?] and followed it also, I guess, but I have always *felt* his agreement was the same as mine and I *felt* that he so indicated to me on that day." On recross-examination the following exchange occurred:

"Q Now, to get this straight, the only sound this man made was a grunt?

"A Yes, sir.

"Q By that you took it to mean that he was part of your deal, is that correct?

"A Well, when I say a grunt, as I said Bob was not a loquacious guy; you might call a grunt was to him saying yes.

"Q Could he have been saying no, a grunt?

"A No.

"Q Did he make a different noise when he said no, I am not trying to be facetious?

"A I would have to say from my knowledge of Bob he was agreeing that there was—

"Q You are not trying to give the Court the impression that he couldn't speak?

"A He was just a very quiet guy and not as emotional as I was. He was never, in my opinion, I'd probably said more.

"Q The only physical reaction at all these meetings was a grunt?

"A No, I think he nodded his head.

*     *     *     *     *     *

"Q (By Mr. Gallagher) The only audible sound is that grunt?

"A You talking about the first occasion?

"Q Yes, sir.

"A Well, he might have said some other things. I just don't remember them.

"Q You remember a grunt and a nod?

"A Yes, sir.

"Q When you and F. M. Webb were discussing your particular deal?

"A Right.

"Q Now, on the second occasion did he make any physical gesture or say anything?

"A That was a rather long conversation and they had quite a few questions of me and so we kind of, were in a general discussion on what was the best way that the stock should be registered, if it should be registered, anything different than it was, for both of them and I wound up saying that they had to go to an attorney and have something done to the document, what their understanding was.

"Q You indicated you were familiar previously to making the stock a joint survivorship?

"A Yes, sir.

"Q Did you suggest that it be done that day?

"A No, I didn't advise them. I told him various ways that I know it could be done and I told them something had to be put down on paper.

"Q Was it specifically brought out if Bob should die what would happen to the stock?

"A Yes, sir, they wanted each other to have the stock in case one of them died; that's the way he put it to me and both of them stated that. I can't tell the exact words.

"Q No one was ever asked to change the registration of the stock?

"A No.

"Q To your knowledge no note was asked or demanded by F. M. Webb from his son Robert Webb?

"A    Not to my knowledge."

Finally under examination by the court, when asked whether he remembered Robert saying that they wanted the stock to go to each other on their death, Fister answered, "To the best of my recollection, yes sir, *I can't specifically say* without, you know, this was the *tenor* of the entire conversation."

■ The decree is reversed. The trial chancellor clearly erred in granting specific performance. Plaintiff's evidence does not prove by clear, convincing and satisfactory evidence the existence or the terms of the oral contract pleaded. Plaintiff alleged a contractual obligation to repay the loans on demand but there is no reference in the testimony to time of repayment before death. The only allusion to this general subject is Fister's testimony that plaintiff knew that *Fister* could not pay plaintiff back the next day. Plaintiff alleged an agreement that the estate of Robert would transfer the securities to plaintiff and that plaintiff would accept them in full payment, but there is no reference in the testimony to estate, transfer or acknowledgment of full payment. There is no satisfactory evidence that Robert actually joined with his father in the making of a contract by the terms of which both agreed that the stock would become his father's property and would be transferred to plaintiff by Robert's estate if Robert died before repayment. There is testimony which, considered alone and out of context, indicates that Robert so "stated," or so "indicated," "by speaking," "by his conversation and speech," by "mumbling," by "nodding his head," or otherwise. If this testimony had stood without modification or explanation that would have been one thing, but Fister's references to these indications of understanding and affirmative agreement and consent on Robert's part are invariably limited and modified by simultaneous or clearly referable expressions by the same witness which are either contradictory or so confusing and indefinite as to cast doubt upon the witness' true meaning. For ex-ample, Fister's testimony that Robert was not talkative and you had to get his understanding from his demeanor; that to Robert a grunt was saying yes; that Fister did not remember things Robert might have said; that he could not recall whether Robert said anything specific; that "to the best of his recollection" Robert said so-and-so; that Fister could not specifically say that Robert said anything specific; that such-and-such was the *tenor* of the conversation; that Fister had no doubt *in his mind* and it was *Fister's* absolute *understanding* that Robert was agreeing, etc. Fister was giving his understanding of Robert's understanding. "Usually one's understanding about a matter is not competent," Cox v. McKinney, 212 Mo.App. 522, 258 S.W. 445, 447–448 (1923), and when a witness' understanding is that of another it is less than reliable. The conclusions drawn by Fister from Robert's actions— what he understood Robert's gestures and audible sounds to mean—provide a weak foundation for a decree of specific performance, and on objection would properly have been ruled out. Smith v. Bocklitz, 344 S.W.2d 97 (Mo.1961). Furthermore, we are assailed by doubt that Robert's mumbling, nodding and other manifestations, if affirmative in nature, were indicative of the fact that he was thereby actually consenting to adopt as his own the understanding reached between his father and Fister. Instead, there is the distinct possibility that these gestures and mannerisms constituted nothing more than acknowledgments that he understood the terms of the agreement between his father and Fister. Apparently not even plaintiff considered that there was a full and complete, definite, final and binding contract arising out of the meeting of September 25, 1968, in view of his introduction of testimony relating to the later meeting of October 18. At the latter meeting Fister, plaintiff's attorney, banker and financial adviser, suggested various methods by which a transfer of the securities to the survivor might be effected, such as placing the securities in the joint names of father

and son with right of survivorship, placing the securities in trust, or bequeathing them by will. Fister told plaintiff and Robert at that time "that they had to go to an attorney and have something done to the document [sic], what their understanding was." This indicates that no one considered that plaintiff and Robert had previously arrived at a binding and enforceable contract with reference to survivorship rights. Stretched to the limit, this testimony indicates nothing more than a present intention to make provision for survivorship sometime in the future by a means or device not yet agreed upon. That is patently insufficient to establish a presently-entered-into enforceable contract of the kind pleaded. Significantly, there is no evidence that anything was done subsequently by plaintiff and Robert to document a definite understanding or agreement with reference to survivorship rights. The matter was left in this indefinite, unclarified, unsettled condition. There is no foundation for a decree of specific performance of an oral contract with clear, explicit and definite terms, in this state of the record.

There is no conflicting evidence on which to urge that the Court should give due deference to the trial chancellor's findings. It is not a question whether Fister was telling the truth and is to believed. Accepting his testimony as the truth to the best of his ability to recount the facts, the question is purely and simply that of construing and interpreting his testimony to determine its real meaning. This can be done as readily from the printed record as from the lips of the witness.

Plaintiff emphasizes his testimony that in a conversation with executrix at the bank following her appointment he said "You know the stock comes back to me * * * you know that I paid for it," and she answered, "Yes, I do because Bob was in Acapulco at that time that I paid for the check." This additional bit of evidence, considered, does not tip the balance in favor of the existence of the pleaded contract.

Plaintiff's failure to establish the existence and content of the pleaded oral contract eliminates the necessity of considering the other three points raised by appellant.

Decree reversed and cause remanded with directions to enter a decree for executrix.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.