Bonford DEWITT and Cecil DeWitt, his wife, Plaintiffs-Appellants,

v.

Earl LUTES, Defendant-Respondent.

No. 10919.

Missouri Court of Appeals, Southern District, Division Three.

May 21, 1979.

James F. Waltz, Cape Girardeau, for plaintiffs-appellants.

Kenneth W. Shrum, Marble Hill, for defendant-respondent.

GREENE, Judge.

This case involves a boundary line dispute, a type of action that has long been a fertile source of litigation in the Ozarks. In February of 1975, plaintiffs filed suit against defendant, in the Circuit Court of Bollinger County, seeking determination of the interests of the respective parties in certain real estate at a point where the lands of plaintiffs and defendant had a common boundary. The disputed area consisted primarily of a small gravel bar located near Crooked Creek in Bollinger County. Plaintiffs, by their petition, and defendant, by his counterclaim, claimed title and right to possession of the area in question.

Trial of the case commenced on March 11, 1976, in the Circuit Court of Bollinger County. Plaintiffs, at that time, were represented by attorney Tim Mullin. Plaintiff Bonford DeWitt was present at the trial but his wife, Cecil, was absent due to illness. Defendant was present in person and by his attorney, Kenneth W. Shrum. Plaintiffs introduced evidence through the testimony of Bonford DeWitt, V. M. Baltz and Robert J. Hahn. At the conclusion of the testimony of witness Hahn, the trial judge stated, "You may step down. It is five after twelve and at this time we are going to take our recess for lunch. I ask that you be back at 1:15 P.M. We are in recess." No further proceedings are shown in the record concerning the trial, other than under date of March 11, 1976, when the following entry appeared on the case docket sheet: "Come plaintiffs by attorney Tim Mullin and defendant by attorney Tim Mullin [sic]. Plaintiff presents testimony. Cause passed for settlement." What occurred in the courtroom, after the noon recess, is not disclosed by any court record or docket entry. No written stipulation of settlement was filed and no record was made in open court by either party concerning the terms of any purported settlement.

The record is barren of any further entry until May 10, 1976, when attorney Mullin filed a motion to withdraw as attorney for plaintiffs, which motion was granted by the court. On May 26, 1976, defendant filed a pleading entitled "Motion to Compel Compliance with Agreed Settlement of Lawsuit". In that motion, defendant alleged that the parties had, on March 11, 1976, during the noon recess of the trial, entered into a compromise settlement of their differences in the presence of the trial judge, and that said compromise settlement and agreement was as follows.

That the plaintiffs and defendant agreed that the division line and property line between their respective properties would be located as follows: That the corner marked and designated by county surveyor, Joseph A. Rielly, would be the corner to be used in arriving at a boundary line for the properties of the respective parties; it was further stipulated and agreed that the boundary lines between the plaintiffs' and defendant's property would run due North from the survey corner of Joseph A. Rielly, county surveyor, to the center of the county road as the same presently exists; that, thereafter, the division between the property would run in a northwesterly direction on a straight line to a point where the said line intersected the center of the county road and the north boundary line of the survey performed for the defendant by Joseph A. Rielly; that the defendant's property line would then run in a westerly direction following the Rielly survey line; and it was stipulated and agreed that all property lying west of the last-described

property line would be the sole, separate and absolute property of the defendant, Earl Lutes, and that the plaintiffs would make, execute and deliver to Earl Lutes a quit-claim deed for all real estate lying west of that said described boundary line; it was further stipulated and agreed that the defendant, Earl Lutes, would make execute and deliver to plaintiffs a quit-claim deed for all property lying east of said boundary line as above described; it was further stipulated and agreed that the court might enter its order quieting the title in the defendant as to land west of said division line and it might enter its order quieting the title in plaintiffs as to land east of said division line; it was further stipulated and agreed that the defendant would pay the costs of the survey to establish the boundary line as above described and the plaintiffs would pay the court costs.

Defendant further alleged the agreement was clearly made and verified, but that plaintiffs refused to abide by the alleged settlement and agreement and refused to execute quitclaim deeds to effectuate the agreement.

In his prayer, defendant asked for judgment against plaintiffs in accordance with his version of the agreement, that plaintiffs be ordered to execute quitclaim deeds, and that defendant be allowed $250.00 in attorney fees. Plaintiffs, through their new attorneys, then filed a pleading entitled "Motion to Strike Defendant's Motion to Compel Compliance with Agreed Settlement of Lawsuit", alleging 1) that defendant's motion was not authorized by any supreme court rule; 2) that plaintiffs had refused and continued to refuse authority to their attorney to settle the lawsuit on the terms indicated in defendant's motion; 3) that plaintiffs had not completed their testimony in the lawsuit, and had not rested their case; and, 4) that any discussion of a proposed settlement during the noon recess was of an informal nature and that any settlement was predicated upon events to

be carried out in the future, to wit, the establishment by a surveyor of a proposed line and approval thereof by plaintiffs. Plaintiffs denied that any completed settlement and agreement was ever made. The trial judge then assigned the case to another division of the court where, on April 8, 1977, an evidentiary hearing was held on the motions.

On October 7, 1977, the trial court entered a judgment and decree sustaining the motion to compel compliance with the agreed settlement, and decreed that during the noon recess of the started but not completed trial, a compromise settlement and agreement had been entered into between plaintiffs and defendant on all matters in controversy and at issue. The trial court found, that as a result of the compromise settlement, plaintiffs and defendant were each vested with fee simple title to certain legally described real estate in the disputed area. The court taxed the court costs against plaintiffs and ordered defendant to pay the cost of the survey that was necessary to obtain the legal description for the judgment and decree. On October 17, 1977, plaintiffs filed a motion for new trial which was not acted on by the trial court. Plaintiffs then appealed to this court.

Plaintiffs raise four points on appeal. They argue that the trial court erred in granting defendant's "Motion to Compel Compliance with Agreed Settlement of Lawsuit" and, in refusing to grant plaintiffs' "Motion to Strike Defendant's Motion to Compel Compliance with Agreed Settlement of Lawsuit" because, 1) even if a valid oral settlement agreement was entered into, it was unenforceable because the settlement was not evidenced by a writing, as required by the Statute of Frauds; 2) defendant failed to establish the existence of the settlement contract with sufficient certainty for the trial court to enter its decree; 3) no settlement contract was created due to mistake of fact, misunderstanding, and lack of mutual agreement; and, 4) the trial court was without authority to grant de-

fendant's motion since the record did not contain a stipulation or memorandum of settlement signed by the parties.

■ Since this was a court tried case, we apply the standards of Rule 73.01(3), V.A. M.R., and, in so doing, review upon the law and the evidence, as in suits of an equitable nature, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. Such review requires that the judgment of the trial court be sustained unless there is no substantial evidence to support its judgment, unless such judgment is against the weight of the evidence, or, unless the court erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

## POINT ONE

■ It is true that no person can be deprived of their property without due process of law, U.S.Const. amends. V and XIV; Mo.Const. art. I, § 10. While it is undisputed that the courts of justice shall be open to every person and certain remedy afforded for every injury to person, property or character, Mo.Const. art. I, § 14, parties to disputes have a right to waive their day in court and to equitably compromise and settle their differences, as it is the policy of the law to encourage freedom of contract and peaceful settlement of disputes. *Sanger v. Yellow Cab Co.*, 486 S.W.2d 477, 480–481 (Mo. banc 1972).

■ A compromise settlement is a contract and, in the absence of specific statute, need not be in writing or in any particular form, unless the subject matter of the compromise is within the Statute of Frauds. In determining whether the Statute of Frauds is applicable to a compromise settlement, the courts are concerned with the intended effect of the compromise, and not with the question whether the parties' antecedent claims are based on matters governed by the Statute of Frauds. If the compromise itself does not fall within the scope of the statute, then the statute is inapplicable to the compromise. Since a compromise which fixes a disputed or uncertain boundary line is not considered to involve a conveyance of land or passage of title, but is considered as an effort merely to clarify and give effect to the title which the parties already have, such an agreement is neither within the scope of the Statute of Frauds nor within the scope of the statutes regarding conveyance of real estate. 15A Am.Jur.2d, Compromise and Settlement, § 10, at pp. 782–783; 12 Am.Jur.2d, Boundaries, §§ 77–79, at pp. 613–616.

■ Missouri courts have consistently adhered to this doctrine. See *Gillenwaters Building Company v. Lipscomb*, 482 S.W.2d 409, 412 (Mo.1972) and cases cited therein. See also *Landau v. St. Louis Public Service Company*, 364 Mo. 1134, 1137, 273 S.W.2d 255, 257 (banc 1954) for the proposition that a settlement agreement need not be in writing unless the subject matter is within the Statute of Frauds. We, therefore, hold that the Statute of Frauds has no application here. The boundary line between the properties of plaintiffs and defendant was uncertain and in dispute, so the parties had a right to orally agree to a true boundary line. If there was such an oral agreement in this case, the parties are bound by it.

## POINTS TWO AND THREE

■ Plaintiffs next contend that defendant failed, at trial, to establish the existence of an oral settlement contract with the certainty required by law to make it valid and binding, and that no settlement contract was created due to mistake of fact, misunderstanding and lack of mutual agreement. Defendant's "Motion to Compel Compliance with Agreed Settlement of Lawsuit" was, in reality, a suit for specific performance. Specific performance is purely an equitable remedy. *McDown v. Wilson*, 426 S.W.2d 112, 117 (Mo.App.1968), and the determination of whether specific performance shall be decreed and what shall be

the terms of the decree rests in the sound judicial discretion of the trial court. *Landau v. St. Louis Public Service Co.*, supra, at 259. A court of equity will not make a contract between parties but will enforce one, if it is definite, certain, and complete, and, in making its decision, the court may rely on parol evidence to show the position of the parties, the subject matter, and other surrounding circumstances. *Biggs v. Moll*, 463 S.W.2d 881, 887 (Mo.1971). The person requesting specific performance has the laboring oar in proving that he is entitled to it and even where, as here, the Statute of Frauds has no application, such proof must be by clear, convincing, and satisfactory evidence. *Webb v. Webb*, 498 S.W.2d 757, 758 (Mo.1973).

▉ It is, therefore, necessary that we review the evidence that was introduced at the hearing. Defendant Earl Lutes, who was the movant, testified that when the trial on the merits in the quiet title suit was recessed for lunch on March 11, 1976, a proposed settlement was discussed by defendant and his attorney. After the discussion, they went back into the courtroom and met with plaintiff Bonford DeWitt, his attorney, Tim Mullin, and the trial judge. Defendant, at that time, in the presence and hearing of those persons, made this settlement offer, which he stated was:

> [T]hat I would be willing to take a line from my corner up to the center of the county road, then up the county road to a point where the line had crossed again, and then in a westerly direction or southwesterly direction up the creek that I would be willing to abandon my claim to land that according to my survey was owned by me on the north and east side of this county road. And that also I would be willing to pay for the surveyor to survey this line and that Mr. DeWitt would pay the court costs.

The offer was made in the presence of DeWitt, his lawyer and the trial judge. The judge then said, "I would like to go up to this place and take a look at this property in dispute so that I will fully understand the agreement being made". DeWitt and his lawyer agreed. DeWitt, the defendant, the lawyers, the trial judge and his court reporter drove to the site of the dispute. The persons referred to got out of their cars and, with the exception of the court reporter, were standing within a "couple of feet" of each other when the judge asked where the starting point of the line would be. Defendant pointed to a red surveyor's marking tape hanging on a bush. Defendant then repeated his offer of settlement. DeWitt was standing next to him at the time. The parties, their lawyers and the judge then walked out the proposed line. The judge then said, "Let me understand this now" and then repeated the settlement offer that defendant had made. The judge then turned to DeWitt and said, "Now, Mr. DeWitt, do you understand this?", and explained the proposal again to him, and DeWitt said, "I understand it but I'm not satisfied. I guess I'll have to go along with it." The judge then said, "Probably Mr. Lutes is not satisfied either", and the defendant said, "No, I'm not satisfied either because I feel like I'm giving up some of my land", and the judge said, "In cases like this where both of you have to give up something, you're not satisfied, usually makes a good agreement." The judge then said, "Well, we all understand the agreement now", and asked Mr. Lutes if he was going to have the survey made. Defendant told the judge that the surveyor had been contacted and would be there that afternoon.

Defendant and DeWitt agreed to meet again at the land site at 2 p. m. so that the surveyor could be there to run the agreed line. Mr. Reilly, the county surveyor; his assistant, Utah Biehler; a neighbor, Milford Rhodes; defendant, his wife, son and sister; plaintiff, Bonford DeWitt and his lawyer Tim Mullin, all went to the gravel bar at 2 p. m. and were at the disputed area where the matter was further discussed. The surveyor set up his compass at the point of beginning that had been previously dis-

cussed and ran the measuring chain across the creek and down the road. He then marked his points and took his measurements to establish the line. DeWitt and his lawyer were in the immediate area when this was done. DeWitt wanted the surveyor to put in a reference stake for him and the defendant agreed. The persons referred to then left the scene. Neither DeWitt nor his lawyer made any objection to the boundary line established by the surveyor.

Joe Reilly, the county surveyor, testified that he had been in the courtroom at noon on March 11th. At the lunch break, the defendant, his attorney, plaintiff Bonford DeWitt, and plaintiffs' attorney all asked him to go to the creek to survey the line. DeWitt stated to the surveyor that they had agreed on where the line was to be placed, and defendant indicated that the matter was settled and a property line had been agreed to. Reilly then ran the line. Neither DeWitt nor his attorney objected to the line, as it was measured by Reilly. Defendant and plaintiffs' attorney both told Reilly that they needed to make quitclaim deeds, and plaintiffs' attorney told Reilly to make up descriptions for the deeds and mail them to him and to the defendant. DeWitt was present when his lawyer made the request. Reilly prepared the description and mailed a copy to DeWitt, or his attorney, and mailed a copy to defendant.

Milford Rhodes, a property owner whose land was in close proximity to the disputed area, testified that on March 11, 1976, he was present at the time the surveyor ran the survey line. Reilly set his transit up and said something to DeWitt. DeWitt looked through the transit and then the surveyor started measuring. Rhodes was standing next to DeWitt, and DeWitt said, "Since this is finished with Earl (Earl Lutes, defendant) I guess this corner being here is goin' to give me trouble with Luther (Luther Felker, another neighbor whose property touched another portion of the gravel bar)."

Judge Stanley Grimm then testified, by deposition, that he had been the trial judge in the original action, but that he had disqualified himself when the Motion to Compel Settlement was filed. Judge Grimm testified that when he recessed the original trial for lunch on March 11, 1976, he talked with the lawyers of both parties relative to a possible settlement. After several comings and goings and conferences between the lawyers and their clients regarding settlement, the lawyers indicated to the judge that a settlement had been made, that a common boundary line had been agreed to, and that the parties would exchange quitclaim deeds to effectuate the settlement. The judge suggested, in order to avoid a dispute later concerning the settlement, that they all go out to the gravel bar and be sure "that all of us knew . . . what the settlement was going to be, or what the boundary line was going to be". DeWitt, Lutes, their lawyers, the court reporter, and the judge then went to the gravel bar. They did not stop to eat lunch as "there were numerous witnesses still to be heard that afternoon, and that if a settlement was satisfactory with everyone we wanted to go back and tell those witnesses they would not have to wait around".

When they arrived at the gravel bar, they looked at some red surveyor flags on the creek bank. As the judge recalled the agreement, one flag on the south bank of the creek was to be a starting point and a line was to be run over the gravel road, then up the center of the road to another point. After considerable discussion and explanation, the judge said to DeWitt, " 'Now are you happy with this particular point, or are you satisfied with it?' " The judge recalled DeWitt answering, " 'I'm not happy, but I am satisfied and I am willing to go along with it', or words to that effect." The judge then asked the defendant a similar question and the defendant indicated that he was willing to be bound by the agreement.

There followed some discussion with both DeWitt and Lutes about having the survey-

or draw up a description to "meet that which they had agreed on there", and some discussion as to who would pay for that expense and who would pay the court costs. As the judge put it, "It was just the typical wrap-up of a lawsuit type of discussion that all of us had been involved in". He stated that the boundary line agreed on in the settlement did not coincide with either the surveyed line that plaintiffs claimed, or that defendant claimed, but was somewhere in between. It was a compromise and therefore, it was necessary that the surveyor give them a description for the new line so that a decree could be prepared, giving the legal description in question, and so that proper quitclaim deeds could be prepared to be signed by the respective parties.

On cross-examination, the judge asked which lawyer had told him in the courtroom that a settlement had been reached. The judge answered that he had been advised by one, or maybe both of the lawyers that a settlement had been reached but couldn't remember who said it, although both were there. No docket entry was made at that time. On redirect examination, the judge said that the settlement boundary line that they all looked at when they went to the creek was just a translation of "the settlement in the courtroom to the settlement on the land to be sure there was no misunderstanding . . . ." The judge also said that the two attorneys, plaintiff Bonford DeWitt and defendant Lutes all looked at the settlement line, walked up the road together, got to the end line, vocalized for a half an hour or more and *"agreed on the particular line"* (emphasis ours). This testimony concluded defendant's evidence.

Plaintiffs then presented evidence. Mrs. Cecil DeWitt, one of the parties plaintiff, testified that she was the wife of Bonford DeWitt and that she did not attend the trial on March 11, 1976, because of illness. She said that Mullin had discussed settlement with her husband prior to the trial, and that she had listened. After the trial, her husband returned to St. Louis, where the De-

Witts lived, and told her the surveyors were supposed to get together and submit a proposal that they were to agree with, or not agree with. On cross-examination, she stated that she had confidence in her lawyer, Mr. Mullin; that she had confidence in her husband and his abilities, and that she had confidence in his ability to handle the lawsuit and matters relating thereto. She had agreed that the lawsuit be tried without her being present. Attorney Mullin never did anything in connection with the lawsuit that she did not want him to do, prior to the date of March 11, 1976. She was aware that Mullin had written defendant's lawyer prior to trial relative to settlement possibilities, and that Mullin had tried, in many ways, to settle the matter without going to trial, and that she was relying on his judgment and her husband's judgment as to the best way to approach the lawsuit. She did not sign the affidavit filed by her husband that was attached to their motion to strike. She testified that she supposed that whatever her husband's decision was (in connection with the lawsuit) was agreeable with her. She thought Mr. Mullin had sent a copy of the proposed decree and the quitclaim deeds to the DeWitts, and she and her husband had discussed the documents. Upon questioning by the court, she admitted that there had been settlement discussions before trial involving the DeWitts, and their lawyer. Mr. Mullin and her husband wanted to settle the case if possible without a hearing. She was aware that Mullin was going to represent both her and her husband at the trial, even though she was not going to be there. She did not have any discussion with Mullin regarding settlement before the trial. She then said she didn't know what was approved or brought up regarding any settlement, other than what her husband had told her.

Bonford DeWitt, in his testimony, said that when he went to the location of the property in dispute, that his lawyer told him that a survey would be made, and quitclaim deeds would be prepared and sent

to him, so that he could consult with his wife and decide on whether they would agree to the proposal as a final settlement. He denied saying to Mr. Rhodes that he had settled with Lutes. He admitted talking to Judge Grimm at the gravel bar but denied telling the judge that he accepted the settlement. On cross-examination, he stated that he had fired attorney Mullin, with his wife's approval, and had gone to Legal Aid to inquire as to the meaning of the term "Passed for Settlement". He had the approval of his wife to hire attorney Mullin and to file the affidavit in opposition to a motion for security for costs. He went to trial without his wife, without asking for a continuance so that she could appear at trial, and had her permission to do so. He knew that defendant had a large number of witnesses at the trial. He admitted that he had discussed settlement with defendant and his lawyer before they went to the site of the dispute; that he received a copy of the survey from Mr. Reilly that he ran on March 11, 1976; that he received a copy of the quitclaim deeds; and that he may have received a copy of the decree from Judge Grimm. He admitted that the boundary line drawn by Reilly after the parties went to the gravel bar was "just as the proposal was put to me by Mr. Mullin". He further admitted, under questioning by the court, that after the meeting at the gravel bar, he came back to the courthouse and participated in discussions relating to the completion of the survey, the general description of the line, the exchange of quitclaim deeds, the payment of court costs, and the payment of the surveyor's fee. He admitted that he never told Judge Grimm, defendant, nor defendant's attorney, at any time, that he thought the settlement was subject to later approval, and he admitted that he did not, at any time, hear his attorney tell anyone the settlement was going to be subject to later approval. Further, he admitted that he was willing to give up something to keep from going back into court. This concluded the testimony for plaintiffs. Neither party presented further evidence.

The evidence referred to above, in our opinion, established that a valid settlement agreement had been made by the parties, and that there was no mistake of fact, misunderstanding, or lack of mutual agreement that would, by law, vitiate the agreement. We hold that the judgment of the trial court, in finding that a valid and binding compromise and settlement agreement had been made and agreed to by plaintiffs and defendant on March 11, 1976, and in decreeing that plaintiffs and defendant were vested with fee simple title to certain real estate in Bollinger County, the legal description of which was contained in the decree, was supported by clear, convincing and substantial evidence, was not against the weight of the evidence, and properly declared and applied the law, thus meeting the tests of *Murphy v. Carron*, supra, and *Webb v. Webb*, supra.

Plaintiffs, in their brief, contend that even if we find that plaintiff Bonford DeWitt agreed to a valid compromise and settlement, that such would not be binding on plaintiff Cecil DeWitt as she did not participate in any settlement discussions, and did not ratify any settlement agreement. We disagree. Cecil DeWitt was a tenant by the entirety in the disputed land with her husband, Bonford. They jointly hired attorney Tim Mullin to represent them in the dispute. Although the lawsuit was set for trial several months prior to March 11, 1976, no continuance was requested when it appeared that she would be unable to attend. The affidavits in opposition to defendant's motion for security for costs and in opposition to defendant's motion to compel performance were not signed by her but were signed by her husband. She admitted that she had authorized her husband to sign a number of documents relative to the case for her benefit, as well as for his benefit. She admitted that she relied on her husband and her attorney to use their best judgment in handling the litigation.

The agency of a husband for a wife, and of an attorney for a client, may

be shown by direct evidence, or by such facts and circumstances as will authorize a reasonable and logical inference that such agents were empowered to act for her, or that she ratified their authorized acts. *Wenneker v. Frager*, 448 S.W.2d 932, 936, 937 (Mo.App.1969). The record is clear that Cecil DeWitt had delegated authority to her husband and to her attorney to settle and compromise the lawsuit and therefore, the settlement that they consummated is legally binding on her.

### POINT FOUR

■ The only remaining point raised by plaintiffs on appeal is that the trial court was without power to grant defendant's "Motion to Compel Compliance with the Settlement Agreement", as the court record does not contain any written stipulation or memorandum of settlement signed by the parties.

Neither *Landau v. St. Louis Public Service Co.*, 364 Mo. 1134, 273 S.W.2d 255 (banc 1954) or *Wenneker v. Frager*, supra, cited in plaintiffs' brief on this point, support their position. In *Landau*, the trial had commenced, as was the situation here. Mrs. Landau's attorney conferred with her and with defendant's attorney, after which Mrs. Landau and the attorneys orally agreed to a settlement. The attorneys then signed a memorandum which said, "passed for settlement". When Mrs. Landau subsequently refused to sign a release and stipulation for dismissal on motion, she was directed by the trial court to comply with the terms of the compromise settlement. See *Landau v. St. Louis Public Service Co.*, 267 S.W.2d 364, 365 (Mo.App.1954). While it is true that in *Wenneker v. Frager*, supra, a written memorandum which had been signed by the parties was filed by one of the attorneys after the case had been passed for settlement, the opinion does not hold that the absence of such a written stipulation would invalidate the settlement.

It is not important that the parties did not follow the procedure utilized in *Fair Mercantile Co. v. Union-May-Stern Co.*, 359 Mo. 385, 387, 221 S.W.2d 751, 753 (1949), of making a record in open court by having the parties testify to the terms of the settlement, or by signing a written memorandum of settlement, as was done in *Wenneker v. Frager*, supra, because as previously stated, a compromise settlement agreement need not be in writing unless the subject matter is within the Statute of Frauds, and we have held that the Statute of Frauds does not apply in this case.

In summary, we conclude that plaintiffs, Bonford and Cecil DeWitt, are both bound by the settlement agreement, as found by the trial court, and that defendant's motion to compel compliance with the compromise settlement agreement was a proper means of seeking specific performance.

Having acquired equitable jurisdiction herein, the trial court retains jurisdiction until full justice has been done.

The judgment is affirmed and the cause remanded for such further proceedings and orders as are necessary to enforce the judgment.

BILLINGS, J., recused.

FLANIGAN, C. J., and MAUS, J., concur.