B.J. EVANS and Eunice Evans,
Plaintiffs–Respondents,

v.

Laura E. WITTORFF, Defendant–
Appellant.

No. 18627.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 1, 1994.

Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, for defendant-appellant.

Randy R. Cowherd, William E. Lawrence, Schroff, Glass & Newberry, P.C., Springfield, for plaintiffs-respondents.

MONTGOMERY, Judge.

On May 16, 1991, B.J. and Eunice Evans (Plaintiffs) brought this action against Defendant Laura Wittorff seeking to quiet title to a 43–acre strip of land in Douglas County, Missouri. The strip lies along the north-south line between two adjoining farms. Plaintiffs own the farm east of the line, and Wittorff owns the one to the west. The crux of the disagreement between the parties is this: if an ancient north-south fence that separates the two farms is considered the legal boundary, then the 43–acre strip belongs to Plaintiffs (i.e., the strip is east of the fence). On the other hand, if the legal description of each farm is used to establish the boundary, the strip would be part of Wittorff's property.

On February 4, 1993, the Douglas County Circuit Court quieted title to the disputed property in favor of Plaintiffs. Wittorff appeals. In her single point relied on, she states the following:

> The trial court erred in granting judgment in favor of Plaintiffs because said judgment is not supported by substantial evidence in that the undisputed evidence establishes that Plaintiff's [sic] grantor agreed with Appellant to establish a disputed boundary line by survey, was estopped from abjuring same after Appellant relied thereon to her detriment, and Plaintiffs failed to prove that their grantor intended to convey title to the land in question to them.

As this point and the argument section of Wittorff's brief make clear, she is asking us to analyze the trial court's judgment in light of three claims:

1) Prior to selling the eastern farm to Plaintiffs in 1991, John Stevens (the seller and previous owner) made an oral contract with Wittorff to allow her to survey the "disputed or uncertain" boundary between the two farms as described in their deeds and to erect a new fence that would legally establish the boundary between them. The trial court erred, Wittorff argues, by failing to recognize and enforce that contract.

2) In the absence of a formal contract, Wittorff contends that the trial court nevertheless should have invoked the doctrine of promissory estoppel to prevent Stevens (and Plaintiffs through him) from claiming title to the 43 acres.

3) Assuming that neither contract law nor promissory estoppel are dispositive, and assuming further that the trial court correctly found that Stevens had gained legal title to the 43 acres via adverse possession, Wittorff claims there was no substantial evidence in the record that Stevens intended to pass title of that strip of land to Plaintiffs.

*FACTS*

The farm Plaintiffs now own (east of the contested boundary) belonged for many years to Herbert and Blanche Denney. The Denneys sold it in 1966 to John Parker, who farmed it until 1978, when he sold it to John Stevens. Stevens farmed the land himself until 1985 and then rented out the farm until 1991, when he conveyed the property to Plaintiffs.

Title to Wittorff's property (the western farm) can also be traced to members of the Denney family. Orville Denney (Herbert's cousin) and his wife, Mona, owned the property for many years until, in 1972, they sold it to a couple named Bothwell. Two years later, the Bothwells sold the farm to Laura Wittorff and her husband, who is now deceased.

Sometime before the respective Denneys owned the two farms, a fence was erected between them. According to testimony adduced at trial, this fence was already standing when Mona Denney moved to the western farm, and it remained standing and in use during the more than 40 years she lived

there and for several years after. Significant portions of the fence are still standing today, and even where it has fallen into disrepair the line it followed is still visible.

Herbert and Orville Denney considered this fence to be the dividing line between their properties. And when Herbert sold his farm in 1966 to John Parker, he told Parker that the 43–acre strip was part of what Parker was buying. As a result, during the 12 years Parker owned the land, he pastured cattle on the strip, cut hay there, and otherwise used it as his own. So too, when John Stevens purchased the farm in 1978, he considered the 43 acres as part of his holdings, and both he and his renter used the strip for various purposes until 1991, when Stevens conveyed the farm to Plaintiffs.

In 1985, Wittorff received notice from the Douglas County Assessor that the assessed value of her farm was being increased. That increase, at least in part, was apparently due to the assessor's decision to add the 43–acre strip to the recorded acreage in Wittorff's farm. Based on the legal description of her property and aerial photographs of the land, the assessor evidently concluded that the 43 acres belonged to her.

Wittorff claims that, in a subsequent conversation with Stevens in 1985, he agreed to let her, at her own expense, survey the boundary between their farms and erect a fence along the surveyed line. His only conditions were that she "make sure she had a good legal surveyor and that she built the fence on the line." One day after this conversation, Stevens moved to Oklahoma, where he still resides.

The next time Wittorff spoke with Stevens about the matter was during a telephone conversation in August 1990, the same year she had the boundary surveyed. (The five-year delay in conducting the survey, Wittorff claims, was due to her inability to find Lebo Spring, a reference point mentioned in her deed for locating the southern end of the boundary.) Shortly before this conversation, Stevens learned from his renter that Wittorff appeared to be preparing to build a fence that would cut across a pond Stevens had previously considered to be entirely on his land. During the telephone conversation, Wittorff told Stevens that the survey indeed indicated that the new fence would cut across the pond. Stevens responded: "[W]ell, if that's on the line, go ahead and put your fence across it."

On April 23, 1991, Stevens entered into a contract with B.J. and Eunice Evans to sell his farm, and on May 24, 1991, he conveyed title to the property to them. On May 16, 1991, Plaintiffs filed this lawsuit in the Douglas County Circuit Court; on July 3, 1991, they filed an amended petition, in which they sought a judgment to 1) quiet title to the disputed strip of land in them, 2) enjoin Wittorff from disturbing the existing common fence line between the parties' respective properties, and 3) declare the parties' rights regarding the dividing line between their respective properties.

At trial, the parties requested that the trial court include with its judgment findings of fact and conclusions of law, pursuant to Rule 73.01(a)(2).[1] The court's conclusions of law fell into two categories, adverse possession and promissory estoppel, and can be summarized as follows:

1. Adverse Possession.

To gain title to real property by adverse possession one must show 10 years of open, notorious, hostile, exclusive and adverse possession. The intent to take property away from the true owner is not relevant; the relevant issue is whether one intended to possess the property. "Clearly," the court concluded, "John Parker acquired title to the disputed [43–acre] tract by adverse possession. This was conveyed to Stevens." Furthermore, "Stevens had the requisite intent to possess [the disputed tract] and did so."

2. Promissory Estoppel.

Four elements must generally be shown to invoke the doctrine of promissory estoppel: 1) a promise was made; 2) the promisee detrimentally relied on the promise; 3) the promisor should have and did foresee the precise action the promisee took in reliance

---

1. Rule references are to Missouri Rules of Court (1993).

on the promise; and 4) injustice can be avoided only by enforcing the promise.

The trial court concluded that Stevens and Wittorff never reached a specific agreement concerning the boundary between their properties, and therefore promissory estoppel was inapplicable. In support of its conclusion, the court cited Stevens' deposition testimony, in which he said he had doubted that Wittorff would ever follow through with the survey and the fence construction, because past experience indicated Wittorff was unreliable. Further, since Wittorff failed to act on Stevens' alleged promise until five years had passed and Stevens was actively trying to sell his farm, the court concluded that her reliance was unreasonable.

■ Our standard of review for court-tried quiet title actions is the same as in other court-tried cases and is well established. We must affirm the judgment if it is supported by substantial evidence, it is not against the weight of the evidence, and the trial court did not erroneously declare or apply the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Whites v. Whites*, 811 S.W.2d 844, 846 (Mo.App.1991).

■ We must exercise our power to set aside a decree or judgment on the ground that it is against the weight of the evidence with caution and only with a firm belief that the decree or judgment is wrong. *Murphy*, 536 S.W.2d at 32. In addition, we must give due regard to the trial court's opportunity to judge the credibility of witnesses. Rule 73.-01(c)(2). The trial judge may believe or disbelieve all, part, or none of the testimony of any witness. *Herbert v. Harl*, 757 S.W.2d 585, 587 (Mo. banc 1988).

■ Our concern on review is whether the trial court reached the proper result, not the route by which it reached that result. A correct decision will not be disturbed merely because the trial court gave a wrong or insufficient reason. *Phillips v. Hoke Constr., Inc.* 834 S.W.2d 785, 789 (Mo.App.1992).

*PROMISSORY ESTOPPEL*

We begin with Wittorff's argument that, even if she had no formal contract with Stevens regarding the survey and fence line, the trial court should have estopped Plaintiffs from claiming title to the 43 acres because their predecessor in interest, Stevens, would have been estopped on the basis of his alleged promise and Wittorff's detrimental reliance on that promise.

■ Whatever may be the merits of Wittorff's argument, we find it unnecessary to consider it, for estoppel will not ordinarily lie against grantees of a conveyance (like Plaintiffs). *Broome & Conkling v. City of Gladstone*, 570 S.W.2d 801, 803 (Mo.App.1978). "The general rule is that a grantee will not be estopped by any act, conduct, or declaration of his grantor of which the grantee had no notice even though such act, conduct or declaration would support an estoppel against the grantor." *Hankins v. Ozark Forest Products*, 658 S.W.2d 915, 918 (Mo. App.1983).

■ Wittorff asserts that, prior to purchasing Stevens' farm, Plaintiff B.J. Evans did have notice or knowledge of facts that would have estopped Stevens from claiming the 43 acres. Therefore, she argues, Plaintiffs should be estopped. We do not agree. The record evidence indicates that, immediately before purchasing Stevens' property, Plaintiff B.J. Evans had learned three things about the disputed boundary, none of which (alone or together) amount to the required notice.

First, because he had become familiar with Stevens' property several years before purchasing it, Plaintiff B.J. Evans knew that the ancient fence had been in place for decades. Second, based on a conversation with Stevens, he knew that, in 1985, Wittorff had asked Stevens if she could survey the boundary and that Stevens had told her she could do so if she paid for it and made sure any new fence "was on the property line." Third, shortly before his purchase, he saw that someone had installed stakes on the western side of the farm, and he learned from Stevens' renter that Wittorff was "claiming it" ("it" presumably being the area between the ancient fence and the stakes). None of this indicates that B.J. or Eunice Evans knew Stevens had allegedly agreed to let Wittorff

establish a new boundary that would vary from the ancient fence.

Wittorff cites *Hankins* for the principle that Plaintiffs should be bound by Stevens' promise as long as they had notice of it. Ironically, the facts of that case provide a sound basis for finding that Plaintiffs had no such notice. Hankins, the plaintiff, purchased from a bank a piece of property the bank had foreclosed on. A year earlier, the former owner of the property (whose mortgage the bank foreclosed on) had executed a "timber deed" to allow the defendant company to cut trees on the property. Subsequently (but before the foreclosure), the bank approved this deed, first during a conversation between company and bank representatives and later in a letter. After Hankins bought the property, he sought judgment "for recovery of said premises" and damages "for unlawfully withholding the same." Defendant claimed Hankins was estopped in his efforts because of the bank's approval of the deed.

This Court found that, although there was evidence Hankins knew about the timber deed prior to purchase (it had been recorded), there was no evidence he knew about the conversation between company and bank representatives or the letter that followed. Knowledge of the timber deed was irrelevant, we concluded, because that deed was wiped out by the foreclosure sale. As a result, because Hankins knew nothing of the conversation or letter, he could not be bound by any agreement the bank may have made.

In the instant case, B.J. Evans knew that Wittorff had surveyed the boundary and was claiming an area east of the ancient fence. However, just as Hankins may have realized that the timber company's deed was extinguished upon foreclosure, Evans testified that, because the ancient fence had been in place more than 10 years, he figured it was the true boundary, regardless of Wittorff's claim. There is no evidence that he knew anything about an alleged agreement to erect a new fence anywhere other than on the ancient fence line. He therefore cannot be bound by such an agreement.

## CONTRACT

■ Wittorff also contends that she and Stevens entered into an express contract, or compromise settlement, regarding the boundary line and that Plaintiffs should be bound by that contract. This contention would suffer the same fate as the promissory estoppel argument, if Plaintiffs could qualify as bona fide purchasers—that is, if they paid valuable consideration, acted in good faith, and had no notice of the alleged contract. *Johnson v. Stull*, 303 S.W.2d 110, 118 (Mo. 1957). As bona fide purchasers, they would take free of any secret outstanding equities not of record. *Hatcher v. Hall*, 292 S.W.2d 619, 626 (Mo.App.1956). Here, we question Plaintiffs' status as bona fide purchasers.

■ The notice sufficient to defeat a claim to bona fide purchaser status is actual or constructive notice of facts that would place a reasonably prudent person upon inquiry as to the title he or she is about to purchase. *Johnson*, 303 S.W.2d at 118. Where surrounding facts and circumstances indicate that a person in possession of property holds it otherwise than through the record owner, appellate courts have uniformly held that the purchaser from the record owner is charged with such knowledge as he or she could obtain by reasonable inquiry from the possessor. *Woodbury v. Connecticut Mut. Life Ins. Co.*, 350 Mo. 527, 166 S.W.2d 552, 555 (1942); *Langford v. Welton*, 48 S.W.2d 860, 863 (Mo.1932). Under the circumstances of this case, B.J. Evans could have asked Wittorff about the stakes and about her "claim" to property east of the ancient fence. The survey stakes could indicate some possession sufficient to warrant a view that Plaintiffs were not bona fide purchasers.

However, Plaintiffs' status need not be decided because the trial court properly determined that Stevens and Wittorff never reached a specific agreement concerning their boundary line. The evidence supports that determination.

The case on which Wittorff chiefly relies, *Kelley v. Prock*, 825 S.W.2d 896 (Mo.App. 1992), is inapposite. In support of her claim that she had a contract with Stevens to establish a boundary, she quotes the following

from *Kelley*, a case this Court decided: "In Missouri and elsewhere an uncertain or disputed boundary line may be established by agreement, written or oral, with possession taken accordingly and continuing; which fixes what each party owns." *Id.* at 899.

We fail to see how this rule or anything else in *Kelley* aids Wittorff. First, the only person uncertain about the boundary line was Wittorff since Stevens had no quarrel with the ancient fence boundary. Second, the evidence of a definite, certain, and complete agreement between Wittorff and Stevens is neither clear nor convincing. Third, there is, at most, scant evidence that Wittorff attempted to take possession of the 43 acres, and there is no evidence that she held it on a continuing basis. Up until the time he conveyed his farm to Plaintiffs, Stevens (through his tenant) continued to use the land as he always had. All Wittorff did was begin erecting a fence that she never completed, along a line that Stevens apparently never saw or specifically approved.

 *Kelley*, and the cases on which it is based, stands for the proposition that long acquiescence in a fence as a boundary constitutes evidence of an agreement to fix an uncertain or disputed boundary. In support of that proposition, this Court relied on the following from *Mothershead v. Milfeld*, 361 Mo. 704, 236 S.W.2d 343 (1951):

> A general doctrine has been stated that long acquiescence in a fence as a boundary line will warrant a presumption that it is the true line. Acquiescence for a length of time is evidence of a parol agreement that the line so delineated is to be considered the boundary line. And, where the line has been acquiesced in for a great number of years by all the parties interested, "it is conclusive evidence of an agreement to that line." The boundary line thus agreed upon should be considered the true one.

*Id.* 236 S.W.2d at 347 (citations omitted); *see Kelley*, 825 S.W.2d at 900.

This quote highlights Wittorff's misplaced reliance on *Kelley*. On the one hand, if she claims that the boundary between Stevens' property and hers was disputed or uncertain prior to 1985, then she can be deemed to have acquiesced in that fence line as the true boundary. From 1974 to 1985 she never challenged Parker's or Stevens' use of the 43 acres east of the fence. On the other hand, by claiming as she does that the dispute or uncertainty arose in 1985 (following the county assessor's appraisal), then she is hampered by the lack of evidence of acquiescence on the part of Stevens or Plaintiffs. Neither Stevens nor Plaintiffs ever allowed Wittorff to use the 43 acres (and she does not claim to have used it), and the fence she started was never completed. As a result, any evidence of a contract must come from some source other than acquiescence in a fence line, and any rationale for enforcing such a contract must come from some case other than *Kelley*.

Unfortunately for Wittorff, the evidence she presented of a contract with Stevens is equivocal at best, and the only other case she cites provides no persuasive rationale for overturning the trial court's decision. From *DeWitt v. Lutes*, 581 S.W.2d 941 (Mo.App. 1979), another case decided by this Court, Wittorff derives the rule that a compromise agreement fixing a disputed or uncertain boundary line is not governed by the statute of frauds or other statutes regulating real estate conveyances and therefore need not be in writing. *Id.* at 945. This is true enough, but nothing else from *DeWitt* bolsters Wittorff's argument, and the facts in *DeWitt* are markedly different from those in the instant case.

In *DeWitt*, this Court enforced a compromise agreement that two parties reached in the midst of a trial, during which the parties, their attorneys and the judge all attended an on-site inspection of the proposed compromise boundary. During that inspection, each party was fully informed of the agreement's terms, what they would be giving up, and what they would receive. In short, they were given the opportunity to understand fully the implications of their agreement and were shown exactly where the proposed new fence would go.

By no stretch of the imagination do the facts in *DeWitt* compare to those in the instant case. Here, there was never a trial or any other action, formal or informal, regarding the boundary. Furthermore, the

discussions that took place between Stevens and Wittorff were general and sketchy. There is no evidence that either party fully understood what they would be giving up or what they would receive. In particular, there is no evidence that Stevens ever understood and specifically approved the placement of the proposed new fence line.

Finding no compelling evidence of a definite, certain, and complete agreement between Stevens and Wittorff, we hold that the trial court did not err in failing to recognize and enforce a contract.

## PASSING TITLE

 Wittorff's final argument is that, even if no basis exists for enforcing a contract or invoking promissory estoppel, Plaintiffs failed to prove that Stevens intended to convey title to the disputed 43 acres to them. This contention also lacks merit.

The following language from *Elliott v. West,* 665 S.W.2d 683 (Mo.App.1984), sheds some helpful light on Wittorff's contention:

It has been held that where parties acquire title by adverse possession to land adjoining land to which they hold record title, and they thereafter convey the latter, intending to vest title to both tracts in their grantee, and the grantee takes possession of the tract adversely held, ownership thereof is transferred to the grantee. This is so even though the grantors have not had title quieted in them prior to the conveyance.

*Id.* at 692 (citations omitted). As Wittorff herself notes in citing this case, a deed will convey title to additional property acquired by adverse possession if the grantor intends to convey the additional property. *Id.* at 693. Parker held the 43 acres by adverse possession, and there is substantial evidence that he intended to convey what he owned to Stevens. Parker said he always used the 43 acre strip as his own because he believed he owned it. Later, after he sold the farm to Stevens, he rented the property, including the 43 acres, for a year and used it as pasture. Undoubtedly, Parker intended to convey the 43 acres to Stevens. Otherwise, he would have had no reason to later rent it. In addition, Parker told Stevens that the

legal description of the property did not much matter, implying that the fence line was the actual boundary. Accordingly, Stevens testified that he assumed he owned the 43–acre strip. He also testified that, when he sold the farm to the Plaintiffs, he intended to sell all he got from Parker. Afterward, Plaintiffs used the 43 acres as their own.

From this evidence, the trial court could reasonably have concluded that Stevens intended to convey his title to the 43 acres to Plaintiffs, along with the described adjoining property.

For the foregoing reasons, the judgment of the trial court is affirmed.

PARRISH, C.J., and SHRUM, J., concur.