ADRIAN O. FRAZIER and EDITH IRVINE, Executors of the Will of GEORGE L. FRAZIER, v. SHANTZ REAL ESTATE & INVESTMENT COMPANY, a Corporation, Appellant.—123 S. W. (2d) 124.

Division Two, December 20, 1938.*

*NOTE: Opinion filed at May Term, 1938, August 17, 1938; motion for rehearing and transfer to Court en Banc filed; motion overruled at September Term, December 20, 1938.

862

*J. L. Miller* and *Ernest E. Baker* for appellant.

*Williams, Nelson & English,* E. G. *Curtis,* Clifford *Greve* and Thomas B. *Curtis* for respondents.

COOLEY, C.—This suit was instituted August 31, 1933, in the Circuit Court of St. Louis County by George L. Frazier as plaintiff against Shantz Real Estate & Investment Company as defendant. We shall herein refer to said parties as plaintiff and defendant, respectively. The plaintiff recovered judgment and defendant appealed. After the appeal was lodged in this court said Frazier died and the cause was revived in the name of his executors, who entered appearance and are now the respondents.

Plaintiff's action is in two counts. The first count is ejectment for a tract of about 18 acres of land, the east part of a larger tract of some 50 or 54 acres in the south half of Section 20, Township 44 North, Range 4 East, in St. Louis County. The whole tract of 50 or 54 acres is bounded on the north by the east and west center line of said Section 20 and comprises all the land in the south half of said section north of the Meramec River and west of the right of way of the Missouri Pacific Railroad Company. The tract in dispute is bounded on the north by said center section line, on the east or northeast for a short distance by the railroad right of way, on the southeast and south by the river and on the west by a line drawn from a point in said east-west center section line 377.57 feet east of the southwest corner of the east half of the northwest quarter of said Section 20 nearly due south to the river, where defendant, in 1931, built a fence, claiming to own the land east of the fence.

The second count of plaintiff's petition is an action to determine title to the same land described in the first count.

Defendant's answer admits possession, denies plaintiff's ownership and avers that defendant is the owner and that it and its predecessors in title have owned and been in possession of said land "ever since said tract, and the parts thereof were formed and deposited as accretions to the adjacent lands of this defendant, to-wit:

" 'The East fractional half of the Northwest Quarter and the West fractional half of the Northeast Quarter of Section 20, in Township 44 North, Range 4 East, St. Louis County, Missouri.' "

By way of counterclaim defendant charges that plaintiff had committed trespass (describing same) upon said land and asked damages therefor.

The court found for plaintiff and against defendant on all the issues presented by the pleadings and entered judgment accordingly, adjudging the title to the land in controversy to be in plaintiff and denying recovery on defendant's counterclaim.

Under the pleadings the action is one at law. By agreement it was tried to the court without a jury. By request of both parties the court stated, pursuant to statute, Section 952, Revised Statutes 1929 (Mo. Stat. Ann., p. 1225), its conclusions of facts found separately from the conclusions of law.

The finding of facts is long. We shall endeavor to summarize the facts, quoting from the court's findings where it appears necessary for accuracy. It may aid in understanding this controversy to state here that, as the court found, defendant claims title to the land in controversy as an accretion to the east fractional half of the northwest quarter and the west fractional half of the northeast quarter of said Section 20, to which it had record title.

Plaintiff's record title starts with a patent from the United States to Elijah Compton, dated October 1, 1840, granting "the southwest fractional quarter and the southeast fractional quarter (north of Meramec River)" of said Section 20, containing 38.87 acres according to the official plat of the survey of said lands returned to the General Land Office by the Surveyor General. By mesne conveyances the land so patented passed, by similar description, to Hudson Brothers Commission Company, which company conveyed to Benjamin Gratz, January 18, 1908, all of said two quarter sections north of the Meramec and southwest of the Missouri Pacific Railroad right of way, and describing the tract conveyed as containing 50.464 acres. Gratz, upon acquiring said land in 1908, recorded a plat showing 50.464 acres in the tract bought from the Hudson Brothers Commission Company and showing the Meramec River well to the south of the east-west center line of Section 20. Gratz conveyed to plaintiff by deed dated June 20, 1920, recorded September 20, 1920, by sub-

stantially the same description, but naming the acreage as 54.64 and referring to a recorded survey made by one "Elbring, Surveyor." All of the conveyances in plaintiff's chain of title purport to convey all the land north of the Meramec River in said southwest quarter and southeast quarter of Section 20 (except, as to the later ones, that east of the west or southwest line of the railroad right of way, not here involved.)

Defendant's record title starts with a patent from the United States dated October 29, 1844, granting to Nicholas N. Destrehan, with a large body of other land, "the east fractional half of the northwest quarter and the west fractional half of the northeast quarter" of said Section 20, the whole grant containing 1383.97 acres "according to the official plat of the survey of said lands returned . . . by the Surveyor General."

The land so patented to Destrehan, along with much other land owned by him, was partitioned among his four children in 1851. The decree in partition was rendered July 3, 1851. Appellant does not set out this decree in its abstract of record. Respondents produce it in their additional abstract. Appellant's counsel state in the abstract that "(The decree sets off to Peter Azby Nicholas Destrehan Lot No. 4 according to Plat 'A' attached thereto containing 650 acres of land—Plat 'A' introduced as Defendant's Exhibit No. 1—and being bounded on the south by the Meramec River.)" There is no evidence shown in the abstract identifying said "Plat A." A photostatic copy of said plat was introduced by defendant as its Ex. 1, without explanation or identification, so far as shown by the abstract. The parties and the court seem, however, to have treated said plat as one made in the course of the partition proceedings, though the record as abstracted does not show that it was. In this connection we note that the court's finding was inaccurate in this particular: The court stated that said east fractional half of the northwest quarter and west fractional half of the northeast quarter were conveyed to Peter Azby Nicholas Destrehan by partition *deed* dated July 3, 1851, as "Lot 4 of Plat A, containing 650 acres, and bounded . . . south by the Meramec River. . . ." There is no partition deed shown. The court must have meant the partition decree. The decree above referred to, which was introduced in evidence, was evidently the interlocutory decree. It makes no mention of "Plat A" or of any plat, nor of the Meramec River as a boundary of the land here involved, nor does it purport to set off to Peter Azby Nicholas Destrehan any land. It describes a large amount of the land and adjudges that said Peter (a son of Nicholas, then deceased), is entitled to a one half interest in all the lands "in the petition mentioned, to-wit:" (describing them). As to land in

Section 20 the description is "the east fractional half of the northwest quarter and the west fractional half of the northeast quarter of Section Twenty." No land in the south half of Section 20 is mentioned. Commissioners are appointed to make partition. The report of the commissioners and the final decree approving it, if such records were introduced, are not shown or referred to in the abstract. Plat A may have been a plat made and returned by the commissioners in the partition suit. It seems to have been so treated by the parties below. It is impossible to tell definitely, from inspection of the plat alone, just what land was meant to be included in Lot 4, as there indicated, but considering the acreage indicated it may be inferred that it was intended to extend southward to the Meramec River, making the river its southern boundary. It seems so to have been assumed below. On said plat the river is shown substantially south of the east-west center line of Section 20.

Proceeding now with the court's finding of facts, the court stated that in the partition proceeding Lot 4 was allotted to Peter Azby Nicholas Destrehan but that there was no legal partition and no legal allotment of land south of the east-west center line of Section 20, the court having been without jurisdiction to partition such land; that by deed of June 3, 1902, Marie Richards, daughter and sole heir of Peter Azby Destrehan conveyed to John E. Love (with other land), "Lot 4 of the Nicholas N. Destrehan estate in Sections 17 and 20, Township 44 North, Range 4 East, and being (describing land in Section 17) and the northeast fractional quarter and the east half of the northwest fractional quarter of Section 20, and together bounded north by Lots 1, 2 and 3 of said Destrehan's estate, east by east line of Sections 17 and 20 and Survey 1975, south by center line of Section 20 running east and west, west by west half of northwest quarter of Section 20 in part and the west line of Section 17, containing 645 acres more or less, except therefrom the right of way of the Missouri Pacific Railroad."

Beginning with a deed by Love in 1902 there were as the court found, six deeds in defendant's chain of title, each describing the land substantially as above set out in the deed from Richards to Love and definitely naming the east-west center line of Section 20 as the southern boundary. The last deed was the one to defendant, dated November 22, 1912.

The court further found:

"That defendant claims title to the land in controversy as accretions to the east fractional half of the northwest quarter and the west fractional half of the northeast quarter of Section 20, in Township 44, Range 4 East, founded upon a patent issued to Nicholas N. Destrehan dated October 29, 1844.

"That the Court cannot determine from the evidence in this case that at the time of the survey by the United States Surveyor in 1818 the Meramec River intersected the east and west half-section line at a point which is now the northwest corner of the land in controversy, and flowed northeast, east and southeast again crossing said half-section line at a point 129.72 feet west of the present west line of the Missouri Pacific Railway right of way.

"The Court finds that in 1870, according to a survey of said east-west half-section line by Pitzman, the Meramec River crossed said half-section line about 400 feet east of where it was shown by the incorrect Government survey aforesaid.

"The Court is unable to determine from the evidence whether or not accretions have formed on the north side of the Meramec River west of Survey 1975 in Section 20 against the east fractional half of the northwest quarter and the west fractional half of the northeast quarter of said Section 20.

"The Court finds that the tract in dispute was carried on the assessment records of the County from 1921 to date in the name of the plaintiff, and plaintiff has paid taxes for all those years on this acreage.

"The Court finds that the County records show that in 1908 the land, or a greater portion of it, was assessed to Benjamin Gratz and others, who conveyed to plaintiff.

"The Court further finds that the western end of the tract, about which there is no dispute, whether taken as 50 acres or 54 acres, has been cleared by plaintiff and is in cultivation; the eastern end, which includes the portion now claimed by plaintiff, was partially cleared and cultivated by plaintiff; the balance is covered with trees and undergrowth.

"The Court finds that in the fall of 1931 defendant ran a fence through the property beginning at a point in the east and west center-section line of Section 20 and running at a slight angle southwardly to the river bank, claiming 18.487 acres on the eastern end of the 54 acre tract. That at about the same time it also made some paths and rough-hewn bridges, and put up a house designated as a refreshment stand east of this fence, and have made use of that portion of the tract since that time.

"The Court finds that there was some controversy about this fence, and at one time plaintiff removed or attempted to remove it; defendant thereupon replaced it.

"The Court finds that defendant did maintain a boat dock on the shore of said property as early as 1910. This dock, however, was never permanently located, and, according to the testimony was at various times in various locations on said property, and was at other

times located farther down the river and east of the property in question, and sometimes on defendant's ground and sometimes adjoining the railway of the Missouri Pacific Railroad Company.

"The evidence shows that at one time plaintiff or his predecessor in title had sold gravel on this ground, and the dock was then taken out by defendant because that particular part of the river was no longer available for dock purposes.

"The Court finds that at no time has defendant paid or made any effort to pay the taxes on the ground in dispute.

"The Court finds from the testimony adduced that the river has not changed substantially in the last fifty years, and at no time during that period has been north of the east and west center-section line.

"The Court finds that plaintiff cultivated the western portion of the tract in dispute, and has been continually clearing the ground towards the east and putting additional acreage in cultivation. The Court finds that plaintiff cleared a portion of the ground east of defendant's fence before the fence was there, and thereupon, being stopped, he promptly thereafter brought this action. That plaintiff had a crop in 1931 east of defendant's fence, and had cut many trees shortly prior to that time for the purpose of putting the ground in cultivation.

"That under license from plaintiff's predecessor in title sometime prior to 1890 there was a gravel plant in operation on the land, which is located by witness at a point approximately where defendant's fence now reaches the river.

"The Court finds that in 1926 plaintiff permitted the licensee of plaintiff to run a fence eastwardly through the property to a point in the river considerably east of the present fence and had used the property to pasture his cattle.

"There is also evidence that plaintiff's grantor, Benjamin Gratz, and the Hudson Brothers Commission Company prior to Gratz, had granted permission to a witness to fish and hunt on the 54 acres, and it was so used by the witness during the years prior to 1908 up to 1920.

"The Court finds that the survey of February 18, 1818, made by the Government, is so erroneous that it is of no value. The field notes of this survey of the meander of the river purport to start at a point in the west line of Section 20, and purport to reach the southwest corner of U. S. Survey 1975 made February 6, 1818, or some twelve days earlier than the survey of the meander of the river. The starting point and the ending point are definite points fixed independent of the survey of the meander of the river, and the ending point is fixed by a prior U. S. Survey. It is impossible, using

the field notes, to close this survey; and, since this is the only evidence upon the point as to whether or not the river cut the east-west center-section line of Section 20 in 1818 at the iron stake shown on Defendant's Exhibit 7, the Court finds that there is no credible evidence of such fact.

"The Court finds that the United States did not part with the ownership of the land in Section 20 south of the east-west center-section line and north of the Meramec River until 1840, and did not part with the ownership of the north half of Section 20 until 1844.

"The Court finds there is no evidence in this case to show the location of the river in 1840 except the erroneous Government survey of 1818.

"The Court finds that plaintiff has a record title and possessory title to that part of the disputed land lying west of a line drawn from the point of intersection of the river and the east-west center-section line (shown by the Pitzman survey of 1870) to the river; and that plaintiff and his predecessors in title had undisputed possession at all times of the major part of the lands covered by their record title and for more than ten years exercised the usual acts of ownership over the entire tract claimed including the disputed land; the Court finds that plaintiff has title to all the disputed lands by adverse possession."

In addition we add that a witness testified that in 1908 he "helped cut the line through when a survey was made . . . cut brush and stuff like that"—evidently the Gratz survey of which Gratz recorded a plat.

Reference is made in the court's findings to a U. S. Survey of 1818. It is necessary to an understanding of this so-called survey and the contentions relative to its application to the issues herein to state the facts concerning it as shown in evidence.

Defendant introduced in evidence the following, said to be "certified copy of field notes of Township 44, Range 4:"

"Meandering of the North Bank of the *Merrameck* from fractional Section Corner Nos. 19 and 20 down the river

"S. 53 degrees E. 20.00 Chains

"N. 43 degrees E. 21.00 Chains

"N. 86 degrees E. 11.50 Chains

"S. 50 degrees E. 12.50 Chains

"S. 17 degrees E. 12.00 Chains

"S. 40 degrees E. 7.50 Chains

"S. 80 degrees E. 3.25 Chains to the corner of Samuel Pruitt Survey thereat set a post corner of fractional Sections No. 20 from which a Maple 16 inches diameter bears S. 72 degrees W. 20 links and a Sycamore 9 inches diameter bears N. 8 degrees W. 42 links. February 18, 1818."

There is in the record no explanation of this exhibit other than what appears on its face, except that other evidence shows the Samuel Pruitt Survey was the Survey No. 1975 referred to in the court's finding; nor does it appear who made these field notes. In this connection we note that defendant also introduced a plat, its Ex. 3, again without identification or explanation so far as shown by the abstract, which merely recites "Defendant's Exhibit 3, being photo-static copy, is inserted opposite this page." On its face said exhibit appears to be a plat of Township 44, Range 4. At the bottom it bears this notation: "Surveyed by J. F. Roiston & A. P. Vanmater D. S. Feby. 1817." It shows a section of the Meramec River north of the center section line of Section 20. It would seem it could hardly be a plat based on the field notes above mentioned since those field notes were not made till about a year later.

Further as to those field notes, it was shown by the evidence that, tracing the meander line by the courses and distances indicated from the named beginning point it did not reach the named point of termination; and reversing the process and tracing back from the latter point by the courses and distances indicated the meander line would not reach the named beginning point. In short, as the court found, the survey indicated by the field notes does not close. A surveyor, called by plaintiff, said there was a method, which he described, of closing a survey in such circumstances. As we understand his testimony and a plat he had made, the survey, if closed in the manner he described, would show the river entirely south of the east-west center line of Section 20. These circumstances relative to the 1818 survey account for the court's findings that there was not sufficient evidence to sustain defendant's contention that the river cut said center section line in 1818.

It is true the court found that according to a survey by one Pitzman in 1870 the river appeared to cut the center line of Section 20 about 400 feet east of where it was shown by the 1818 field notes. The Pitzman survey was not offered in evidence, but plaintiff's witness Elbring, a surveyor, had made a plat, introduced by plaintiff, on which he had traced what he said was the line of the river as shown by Pitzman's survey. But we do not understand defendant to be basing its claim to the land in dispute on the theory that a small section of the river was north of the center line of Section 20 in 1870, according to Pitzman's survey. To do so would exclude a very considerable portion of the disputed land it claims. Had such theory been advanced below the trial might have taken a different course and other evidence might have been offered. Defendant's theory, as indicated by its pleading, its course in the trial and its brief here appears to be that the river was north of the center line of Section 20

in 1818, as shown by the field notes, supra, that the land in the east half of the northwest quarter and west half of the northeast quarter of said section was riparian when patented to Destrehan and that the land in dispute is an accretion which has gradually and steadily formed thereto without any interrupting recession or northward movement of the river. We shall treat the case from the standpoint of the theory on which it was thus tried below.

Thus considering the case, if, as the court found, there is no substantial evidence that the river cut said center section line in 1818, defendant has no record title. And if the river was then north of said center line, yet it may have been south thereof when the United States issued its patents to Compton in 1840 and to Destrehan in 1844. The southward movement of the river may have been slow but it did not have far to go to reach and pass to the south of the center section line. Elbring computed the acreage between named points of the land north of the center section line and south of the meander line of the river as indicated by the 1818 field notes, tracing said meander line by the indicated courses and distances from its named beginning point as far as it went, at 5.46 acres. From his plat, on which said lines are shown, it is apparent that the area computed by him comprised nearly all the land north of the center section line and south of said meander line. By comparison of the small triangular portion not included in Elbring's computation with the area computed by him it is apparent from the plat that said small portion not included in the computation could scarcely have amounted to an acre.

There is no evidence from which it can be determined where the river was with reference to the east-west center line of Section 20 when Compton's patent issued in 1840, over twenty-two years after the 1818 survey, or when Destrehan's patent issued in 1844. Since defendant claims the land in controversy as an accretion to lands patented to its predecessor in title which it claims were then riparian we think it was incumbent on it so to show. Its muniments of title prima facie show the east-west center line of Section 20 as its southern boundary, as plaintiff's muniments of title show said line as his north boundary. [2] We take judicial notice of land descriptions in the Government surveys. [Myher v. Myher, 224 Mo. 631, 123 S. W. 806; Federal Land Bank v. McColgan, 332 Mo. 860, 868, 59 S. W. (2d) 1052, 1055 (10-14).] In Hartt v. Rector et al., 13 Mo. side page 498, 506, it is said that a description by governmental subdivisions is a description by metes and bounds. To same effect see Hampton v. Helms, 81 Mo. 631, 635. ". . . by a description by subdivisions according to government survey 'we specify and describe as particularly as if we marked out the boundaries and described each line and specified each corner.' " [Ohlson v. Batter-

ton (Mo.), 230 S. W. 110, 112, citing and quoting from Hartt v. Rector et al., supra.].

Defendant contends that the call in the patent and deeds in its chain of title for the east fractional half of the northwest quarter and the west fractional half of the northeast quarter would carry by such description all accretions thereto whether already formed when the Destrehan patent issued or formed subsequently; citing Jeffries v. East Omaha Land Co., 134 U. S. 178, Gorton v. Rice, 153 Mo. 676, 55 S. W. 241, and like cases. If it be conceded to appellant that its contention would be correct, absent a reservation of accretions in the conveyance or a prior conveyance thereof by the owner, we think it cannot avail in this case even if it be assumed that said fractional half quarter sections were riparian in 1818, because:

Prior to the patent to Compton in 1840 all the land, both north and south of the east-west center line of Section 20 (so far as pertinent to this case), belonged to the United States. We think it clear that a landowner to whose riparian land accretions have formed, thereby becoming his and extending his boundary, may sell and convey title to a part of such accreted land, even though it leaves the remainder of his land non-riparian (see Frank v. Goddin, 193 Mo. 390, 397, 91 S. W. 1057) ; and that if he does so a subsequent conveyance by him by a description which otherwise would carry all of the accreted land cannot give title to the portion previously conveyed nor affect the title of the prior purchaser. That question was not involved in the cases cited by appellant. The description of the land patented to Compton, the southwest and southeast fractional quarters of Section 20 north of the Meramec River,—made the east-west center line of the section his northern boundary, leaving no riparian land north of said center line to which accretions could thereafter form, if the river was then wholly south of said line. All subsequent conveyances in plaintiff's chain of title made said center section line the northern boundary. Plaintiff thus made at least a prima facie showing of good record title, which was not overcome by other evidence.

For a further reason we think defendant's record title fails. The petition and decree in the partition suit in which the Destrehan lands were partitioned described the lands to be partitioned, so far as here pertinent, as the east fractional half of the northwest quarter and the west fractional half of the northeast quarter of Section 20. It appears there was an order of publication in the partition suit. The published notice is not set out in the abstract but it is there stated that said notice described the above named half quarter sections as the west half of the northeast quarter and the east half of the northwest quarter of said Section 20. In said petition and decree and, as indicated, in the publication notice, the river is not men-

tioned as the southern boundary but the description of lands to be partitioned makes the east-west center section line the boundary. Lands south of said center line are not included, at least unless, as accretions to said half quarter sections, they are included as part thereof under the general designation of the half quarter sections. But that theory is not tenable because, as we have shown, there is no evidence that said half quarter sections were riparian when the patents above referred to issued. The court could not partition land not subject to its jurisdiction in the given case. See Heirs of Burnham v. Hitt, 143 Mo. 414, 45 S. W. 368, where the plaintiffs claimed as heirs of the purchaser at a partition sale and their claim was denied because the land claimed had not been included in the petition and order of sale in the partition suit. The court said, 143 Mo. l. c. 421, 45 S. W. l. c. 370: "A partition sale is a judicial sale, and it is an indispensable prerequisite to the validity of such a sale that it should be based upon a valid judgment, decree or order of sale. . . . The sale of land not included in the decree by the sheriff is without authority of law and his deed conveys no title thereto." We perceive no reason why the same principle should not apply to an allotment of land in kind in a partition suit.

The foregoing considerations make it unnecessary for us to determine defendant's contention that the deeds from Mrs. Richards and subsequent parties in its chain of title show an intent to convey all of Lot 4 as shown by "Plat A" and that the description "Lot A of the Nicholas N. Destrahan Estate" should prevail over the call for the east-west center line of Section 20 as the southern boundary, for if Mrs. Richards had no title to the land south of said center line she could convey none nor could her grantee and his successors.

We think under the facts shown plaintiff had good record title. But even if it should be held that he had only color of title he at least had that. In the conveyance to him and in the prior conveyances by his predecessors the land north of the Meramec River and south of the center section line, whether, as the trial court said, it contained 50 acres or 54 acres, was conveyed as a single tract, of which the land in dispute is a part. It is conceded that for more than ten years prior to the date of ouster alleged in plaintiff's petition he and his predecessors had been in actual possession of that part of said tract west of where defendant built its fence in 1931, and indeed that plaintiff owned said west part. The court found that he and his predecessors had claimed the disputed land and had exercised the usual acts of ownership over it. Under the statute, Section 854, Revised Statutes 1929 (Mo. Stat. Ann., p. 1129), possession, under color of title, of part of a tract of land in the name of the whole tract claimed, and exercising, during the time of such

possession, the usual acts of ownership over the whole tract claimed, is deemed possession of the whole of such tract.

What acts will characterize possession as "actual" depend on the facts of particular cases. The nature and location of the property, the uses to which it can be applied and all the circumstances must be considered. [Ozark Plateau Land Co. v. Hays, 105 Mo. 143, 16 S. W. 957; Goltermann v. Schiermeyer, 111 Mo. 404, 421, 19 S. W. 484.] So in determining what acts constitute usual acts of ownership we think such facts and circumstances must be considered. And it is said that "the statutory constructive possession of an entire tract, which accompanies actual possession of a part would require act of ownership less specific 'than would be required of one who enters without right and retains possession by wrong.'" [Goltermann v. Schiermeyer, 125 Mo. 291, 301, 28 S. W. 616.] Also, in the last above cited Goltermann case, 125 Mo. l. c. 300, 28 S. W. l. c. 619, the court said, quoting from McDonald v. Schneider, 27 Mo. 411: "When two persons possess adjoining tracts, and their possession conflicts, or interfere one with the other, the legal possession is adjudged to be in him who has the better title; . . ." and further, same book and page, quoting from prior opinion in that case, "As the plaintiff is the rightful owner of his farm, and is in possession of a part, that possession will draw to him possession of all the land embraced in his muniments of title which is not in the actual exclusive possession of the defendant; and this would be true if defendant had color of title. The defendant, to defeat this action, must therefore show actual, exclusive possession for the period of ten years before the commencement of this suit." In the instant case defendant did not show such actual, exclusive, adverse possession. Without further detailing the facts, we think, the circumstances considered, there was substantial evidence to sustain the court's finding on the issue of adverse possession.

■ Appellant says in its brief that the court's statement in its finding of facts that it could not determine whether accretions had formed against the west fractional half of the northeast quarter and the east fractional half of the northwest quarter of Section 20 was not a finding of fact but only a finding that there was no substantial evidence that accretions had so formed. If that be conceded it does not help defendant's case because it was incumbent on it to show that its southern boundary was riparian when the patent to Compton issued and there was no substantial proof that such was the fact.

There are other complaints that the court's findings are "contrary to the law and the evidence" and unsupported by substantial evidence, which we deem it unnecessary to discuss. The action being

at law we are concluded on appeal by the trial court's finding of facts if supported by substantial evidence and we think that on the material facts decisive of the case it is so supported.

 Lastly it is urged that the court erred in allowing plaintiff to introduce his evidence of adverse possession in rebuttal and not limiting such evidence to rebuttal of defendant's evidence on that question. Plaintiff in his petition merely alleged that he was the owner of the land in question, without specifying the source of his title, and that defendant claimed title and "some interest" in the property, and prayed adjudication of the title. The petition was not challenged below nor is it here as being too general or as insufficient to authorize proof of title by adverse possession. Plaintiff introduced his evidence showing, prima facie, record title in himself and rested. Defendant introduced evidence of its record title and evidence apparently designed to show adverse possession in itself (though it had not pleaded adverse possession or the Statute of Limitation in support of its claim of title and prayer for adjudication thereof.) Plaintiff then offered his evidence tending to show title by possession, acts of ownership, etc., as outlined above. Defendant asked that the court limit the consideration and effect of such evidence to rebuttal of defendant's evidence relating to its possession. The court declined so to limit plaintiff's evidence. Defendant complains of that ruling, citing Laclede Land & Imp. Co. v. Goodno et al. (Mo.), 181 S. W. 410, 413 (5), where the plaintiff, "under the guise of rebuttal, took a complete departure from its case in chief" by attempting to show facts antagonistic to and contradictory of its evidence in chief. The court said: "We know of no rule of legal procedure in this State which would warrant a plaintiff, after having been signally defeated as to his case in chief, to take a departure and attempt to recover upon a state of facts directly contradictory of his case in chief." Clearly the above quoted observation is not applicable to the case before us. Here the rebuttal evidence complained of was not inconsistent with plaintiff's evidence in chief tending to show record title. It was competent as rebuttal of defendant's claim of title by adverse possession and its testimony introduced to sustain said claim, and while it might well have been offered in chief and perhaps should have been, yet, since it was competent as rebuttal of evidence offered by defendant to show possession on its part (as defendant in effect admitted in the trial), it could not properly have been excluded entirely. Defendant had the right and opportunity to introduce and did introduce some testimony in surrebuttal. Moreover some of plaintiff's said rebuttal evidence came in before defendant's request that its consideration and effect be limited as above stated. Under the circumstances we are satisfied

there was no prejudice to defendant or abuse of the court's discretion in the refusal so to limit said evidence.

The judgment of the circuit court is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.