Curtis L. ELLIOTT and Delane G. Elliott, Appellants,

v.

Ernest WEST and Maxine West, Respondents.

No. 13144.

Missouri Court of Appeals, Southern District, Division Three.

Feb. 9, 1984.

Motion for Rehearing or Transfer Denied Feb. 22, 1984.

Joseph S. Sanchez, Festus, for appellants.

Karen J. Miller, Hyde, Purcell, Wilhoit, Spain, Edmundson & Merrell, Poplar Bluff, for respondents.

CROW, Presiding Judge.

This is a dispute over a three-sided 2.96 acre parcel of land ("the triangle"). The triangle lies in, and is part of, a 42.6 acre tract designated as lot 8. Lot 8 lies in an unincorporated area of Butler County.

Appellants are the record owners of lot 8. They sued respondents to quiet title to the triangle, alleging that respondents claimed an interest therein adverse to appellants.

Respondents counterclaimed, asserting title to the triangle by adverse possession. In a second count, respondents sought damages from appellants for trespassing on the triangle.

Appellants later added a count of their own against respondents for trespass.

The cause was tried without a jury. The trial court ruled for respondents and against appellants on both of appellants' counts. The trial court ruled for respondents on their claim of ownership, but denied respondents' count for trespass.

On appeal, appellants contend the portion of the judgment declaring that respondents own the triangle should be reversed because the evidence was insufficient to support respondents' claim of ownership by adverse possession. Appellants assign no error regarding the denial of their count for trespass. Respondents did not appeal from the denial of their count for trespass.

To comprehend the evidence, it is necessary to visualize lot 8 and the triangle. The northern and southern boundaries of lot 8 are essentially straight, and run east-west, parallel to each other. The eastern boundary of lot 8 is also straight, and runs north-south, perpendicular to the northern and southern boundaries.

The triangle lies at the west end of lot 8. The western side of the triangle is the western boundary of lot 8. Beginning at the northwest corner of lot 8, the western boundary runs in a generally southeast direction, and is slightly convex. A railroad owns the land west of the western boundary.

The northern side of the triangle is a segment of the northern boundary of lot 8. That segment separates lot 8 from a tract identified as lot 4, which lies north of, and abuts, lot 8.

The northwest corner of lot 8 and the southwest corner of lot 4 are the same point. Lot 4 does not extend as far to the east as lot 8, that is, the southeast corner of lot 4 lies west of the northeast corner of

lot 8, both points falling on the same east-west line. Another tract (lot 5), not in dispute here, lies immediately east of lot 4 and abuts the north side of lot 8 east of the southeast corner of lot 4.

The eastern side of the triangle is a line that begins at the southeast corner of lot 4 and runs south 593 feet across lot 8 to the convex boundary between lot 8 and the railroad land.

The triangle, then, has these sides: (1) a straight north side (the boundary between lots 4 and 8), (2) a straight east side which begins at the east end of the north side (that point being the southeast corner of lot 4) and runs south across lot 8 to the railroad boundary, and (3) a convex west side which runs along the railroad boundary from the south end of the east side of the triangle to the west end of the north side of the triangle (the latter point being the northwest corner of lot 8). The west side of the triangle is the longest. By reference to the scale on a survey map, the west side appears to be approximately 681 feet in length, and the north side approximately 342 feet. The east side of the triangle, as previously noted, measures 593 feet.

Farrington Elliott, who died in 1979 while this cause was pending, testified by deposition that he began living on lot 8, east of the triangle, in 1903. About 1917, he acquired ownership of lot 8 from his father. In 1971, Farrington deeded lot 8 to his son, appellant Curtis L. Elliott, subject to a life estate which Farrington reserved for himself. Curtis then deeded lot 8 to himself and his wife, appellant Delane G. Elliott, subject to Farrington's life estate.

Farrington Elliott lived on lot 8 continuously from 1903 until his death, except for a time during World War II when he worked in defense plants. Curtis Elliott lived on lot 8 from his birth in 1934 until his marriage in 1956. After marrying, Curtis returned regularly to visit his father.

Evidence regarding title to lot 4 showed that in 1936 it was owned by four Magill brothers, having been "left" to them by their father. The brothers continued to own lot 4 until 1960 when three of them,

and their respective wives, deeded their interests to the fourth brother, John, and John's wife, Opal. John died the next year, 1961.

In 1971, lot 4 was sold for delinquent taxes by the collector at public auction. Respondents purchased lot 4 at the tax sale, and also obtained a warranty deed from Opal Magill. Respondent Ernest West explained that respondents had agreed earlier to buy lot 4 from Opal, but decided to purchase at the tax sale "to improve the title." According to Ernest, there were "flaws" in the Magill estate.

When respondents bought lot 4 in 1971, there was a fence ("the north-south fence") along the entire east side of the triangle, separating the triangle from the rest of lot 8. According to Farrington Elliott, the north-south fence was built in 1905 and rebuilt about 1910. It remained in place until 1978 when, according to Farrington, it "rotted down."

Ernest West testified he first became familiar with the triangle in 1951 when he bought 40 acres in lot 5. According to Ernest, he lived on that 40 acres until 1959, and during that period the north-south fence was intact. Ernest recalled seeing John and Opal Magill and Farrington Elliott maintaining and repairing the north-south fence.

Ernest explained that during those years (1951–1959) he believed the "Magill estate" owned the triangle because he saw John and Opal Magill "running cattle" on the triangle "every fall."

Ernest related that he moved in 1959, but returned to the triangle occasionally thereafter for "recreational purposes," obtaining permission to go on the triangle from John and Opal.

Ernest testified that when he bought lot 4 in 1971, Opal told him that the Magill property included the triangle, and that the north-south fence was the east boundary. Ernest explained, "I thought I purchased what was under the fence boundaries."

In that regard, the west side of the triangle (the side abutting the railroad land) was, like the east side of the triangle, marked by a fence when respondents bought lot 4. The fence on the west side of the triangle ("the railroad fence") was, according to Farrington Elliott, built by the railroad in 1912. The railroad fence was still in place in 1978 when Ernest West had the triangle surveyed.

All witnesses agreed that at the time of the tax sale, there was no fence along the north side of the triangle separating the triangle from lot 4. Thus, when respondents acquired lot 4, the triangle was (a) separated on the east from the remainder of lot 8 by the north-south fence, which had been there some 66 years, (b) separated on the west from the railroad land by the railroad fence, which had been there some 59 years, and (c) open to lot 4 on the north.

The triangle remained open to lot 4 on the north until October, 1978. At that time, Farrington and Curtis Elliott, aided by Curtis' wife Delane, built a barbed wire fence ("the 1978 fence") starting at the southeast corner of lot 4 and running westerly across lot 4 at an angle a few degrees north of the line between lots 4 and 8. The 1978 fence terminated on the west at the railroad fence. Because of the angle at which the 1978 fence was built, its length (374 feet) was greater than the length of the north side of the triangle (approximately 342 feet).

In November, 1978, Ernest West cut the 1978 fence in several places, but allowed the steel fence posts to remain in place.

There was a conflict in the evidence as to whether there had ever been a fence along the north side of the triangle prior to the 1978 fence. Farrington Elliott recalled that in 1929 a pipeline was put in along the southern part of lot 4, running "in an east-west direction," and that the pipeline company put up a barbed wire fence on lot 8 "maybe twenty or thirty feet" south of the boundary between lots 4 and 8. Farrington explained that the pipeline company left a gap in the fence "for a road down to the beer joint and it never was closed."

According to Farrington, neither the pipeline company nor anyone else ever maintained that fence.

Curtis Elliott recalled a barbed wire fence along the pipeline, but described its location differently than Farrington. According to Curtis, the fence began at the southeast corner of lot 4 and ran northwest across lot 4, crossing the pipeline before reaching the railroad boundary. Curtis testified that remnants of the pipeline fence were still present in 1971, but were removed after respondents bought lot 4.

A man who lived on lot 5 from 1936 until 1939 recalled an "old barbed wire fence" that ran across the south part of lot 4 and crossed the pipeline east of the railroad fence.

Ernest West testified that prior to the 1978 fence, there had never been a fence along the pipeline since he became familiar with the property in 1951. Opal Magill, who became familiar with lot 4 in 1935, recalled no east-west fence anywhere across lot 4 or the triangle. The surveyor who mapped the property in 1978 saw no remnants of an older fence on the south part of lot 4. Additionally, a witness who hunted on the triangle each year from 1953 to 1980 saw no remnants of an old fence in that area.

Before detailing the acts of possession on which respondents rely to support their claim of ownership, we take note of some well settled precepts regarding adverse possession.

 The party asserting title by adverse possession has the burden of proving the existence for the entire statutory period of each and every element of adverse possession. *Conran v. Girvin,* 341 S.W.2d 75, 90[14] (Mo. banc 1960); *Teson v. Vasquez,* 561 S.W.2d 119, 125[1] (Mo.App. 1977). Such party must show actual, hostile, i.e., under a claim of right, open and notorious, exclusive and continuous possession of the property for 10 years. *Walker v. Walker,* 509 S.W.2d 102, 106[1] (Mo. 1974); *Teson,* 561 S.W.2d at 125[2]; § 516.-010, RSMo 1978. Failure to prove any one

element prevents the ripening of title by adverse possession. *Allen v. Wiseman,* 359 Mo. 1026, 1029, 224 S.W.2d 1010, 1012[1] (1949); *Teson,* 561 S.W.2d at 125.

■ Respondents' theory, as stated in their brief, is that they and their predecessors in interest (the Magills) were in adverse possession of the triangle from 1935 until 1978. Respondents do not contend that respondents' acts of possession from and after 1971 are alone sufficient to establish title by adverse possession, but they argue that their acts, coupled with those of the Magills, are sufficient to support the judgment. It thus appears that respondents rely on the rule that where land adversely held is included in the same enclosure with land owned and conveyed by the grantor, and the grantor delivers possession to the grantee of the entire enclosure, the taking of possession by the grantee of the enclosed area creates a privity with the grantor as to the portion not conveyed, and the possession of such a grantor becomes tacked to that of his grantee. *Auldridge v. Spraggin,* 349 Mo. 858, 865[8], 163 S.W.2d 1042, 1045[11] (1942). In such circumstances, the continuity of possession is not broken, and the two possessions may be joined and considered as one continuous possession. *Crane v. Loy,* 436 S.W.2d 739, 743–44[5] (Mo.1968).

There was scant evidence about the fences that enclosed lot 4; however, we glean from the record that the railroad fence continued northwesterly along the western side of lot 4 from the northwest corner of lot 8. Additionally, the 1978 survey map shows a fence separating lots 4 and 5. This fence begins at the southeast corner of lot 4 and runs north. Thus, its south end is the same point as the north end of the north-south fence that separated the triangle from the rest of lot 8 from and after 1905. The record does not reveal how long the fence between lots 4 and 5 had been in place prior to the survey, but there were references to it in the testimony of Opal Magill and Farrington Elliott, and it was evidently there at the time of the tax sale.

Regarding the Magills' possession of the triangle, Opal testified she married John in 1936 and they began pasturing cattle on the triangle in 1936 or 1937, continuing to do so every year until John died (1961). Sometimes, they also pastured cattle owned by John's brothers. Opal explained that she, with John's help, maintained the north-south fence by fastening wire to trees every fall before moving the cattle in. Opal recalled that the Magill brothers gave permission to a logger to cut all merchantable timber on the triangle about 1936 or 1937. She added that she and John hunted and fished on the triangle from 1936 until 1961. Opal remembered seeing Farrington Elliott perform maintenance on the north-south fence, but she never saw him or any of his sons pasture cattle, cut timber, hunt or do anything else on the triangle.

John and Opal lived near lot 4 from the time of their marriage until John's death, but they never lived on lot 4 or the triangle, nor did any of John's brothers.

According to Opal, she believed the Magill brothers owned the triangle from 1936 until 1960, and that she and John owned it after the deed from his brothers. Opal testified that when she sold her property to Ernest West, she intended to sell him the triangle, believing it was hers.

Farrington Elliott testified that in the late 1920's two doctors built a "clubhouse" on the triangle and paid him rent of $10 per year. According to Farrington, the pipeline company hired a night watchman, and the watchman and his family lived in the clubhouse until 1932. At that time, the watchman died and his widow and children left. No one lived on the triangle after that, and the clubhouse was "long gone" when Farrington's deposition was taken in 1979.

Opal Magill recalled the clubhouse and the watchman's widow. According to Opal, she and John moved the widow to Greenville, then, with the permission of John's brothers, tore the clubhouse down in 1936 or 1937, rebuilding it at another location.

Curtis Elliott recalled the clubhouse, but contradicted Opal's testimony about its removal. According to Curtis, the clubhouse "rotted and fell down" in the early 1940's.

Opal Magill testified she moved the cattle from the triangle following John's death, and thereafter she was not on the triangle more than a half dozen times.

Ernest West testified that since 1971 he had hunted and camped on the triangle, and had cut wood there two or three times. In 1972, and again in 1976, Ernest used a bulldozer to clear an old road from lot 4 south to where the clubhouse had sat on the triangle. Additionally, Ernest recalled that in 1972 or 1973, his son and a neighbor had tied up portions of the north-south fence that had fallen.

Farrington Elliott testified he never planted crops on the triangle, and prior to 1978 he never ran cattle on it. He explained that the house where he was living in 1979 was the third house on that site. The first burned in 1910 and the second in 1938 or 1939. Farrington testified that after the first fire, he helped his father cut timber on the triangle to rebuild, and after the second fire he again cut timber on the triangle to rebuild. According to Farrington, he cut no timber on the triangle other than those two instances.

Curtis Elliott recalled cutting timber on the triangle to rebuild the house in 1939, and added that he and his father obtained firewood from the triangle each year from 1939 to 1956. Curtis said they also cut wood there for other purposes, and that he hunted on the triangle.

Curtis recalled helping Farrington put new wire in the north-south fence in 1942, and performing maintenance on it "many, many times." Curtis and Farrington denied that the Magills ever pastured cattle on the triangle, although Curtis conceded the Magills had cattle on lot 4.

It was evidently the 1978 survey that prompted this suit. The surveyor testified that in mid-1978 he told Curtis Elliott that lot 8 ran west "to the river" (Black River lies immediately west of the railroad land).

According to the surveyor, Curtis was "somewhat surprised."

Curtis denied this, insisting he had known the triangle was part of lot 8 since 1939.

Curtis testified that in September, 1978, he told Ernest West that the north-south fence was becoming very bad and that Farrington wanted to put a fence where the pipeline fence had been, and turn cattle on the triangle. Curtis quoted Ernest as saying he (Ernest) was going to take the triangle through adverse possession.

Ernest West recalled the conversation differently. According to Ernest, Curtis said the triangle belonged to the Elliotts. Ernest replied that he understood the triangle was Magill land. Ernest said he told Curtis there was no reason to get upset, but the only way Ernest would accept Curtis' claim was through court.

Curtis testified he thereafter took down the north-south fence because it would no longer hold his father's cattle. Curtis explained that the purpose of that fence had been to keep cattle off the triangle, which formed a "bluff" on its western side. Curtis admitted, however, that large portions of the bluff lie west of the railroad fence.

Simultaneously with the removal of the north-south fence, Curtis and Farrington built the 1978 fence along the north boundary of the triangle. Curtis explained they put the 1978 fence south of where the pipeline fence had been "to make sure we were well within our boundaries." After the 1978 fence was installed, Farrington ran cattle on the triangle. As recounted earlier, Ernest West cut the 1978 fence soon afterward. This allowed Farrington's cattle to escape, and he thereafter pastured no cattle on the triangle.

 Inasmuch as this cause was court-tried, the judgment must be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Trenton Trust Co. v. Western Surety Co.*, 599 S.W.2d 481, 483[1] (Mo. banc 1980); *Murphy v. Carron,*

536 S.W.2d 30, 32[1] (Mo. banc 1976). Additionally, no findings of fact or conclusions of law were requested by the parties, or made by the trial court, thus all fact issues are deemed found in accordance with the results reached and the judgment must be affirmed under any reasonable theory supported by the evidence. *Lurtz v. Ehlers,* 608 S.W.2d 147, 148[1] (Mo.App.1980); *Porter v. Posey,* 592 S.W.2d 844, 848[3] (Mo. App.1979). Furthermore, we must accept as true all evidence and permissible inferences favorable to the prevailing party and disregard any contradictory evidence. *Ayers Plastics Co. Inc. v. Packaging Products Corp.,* 597 S.W.2d 177, 179 (Mo.App. 1979); *S.G. Adams Printing & Stationery Co. v. Central Hardware Co.,* 572 S.W.2d 625, 628 (Mo.App.1978).

Applying these rules, we address the five elements of adverse possession to determine whether each was established.

▆ The first element is actual possession. What acts will characterize possession as "actual," so as to ripen into title by adverse possession, depend on the facts of the particular case; the nature and location of the property, the uses to which it can be applied, and all the circumstances must be considered. *Allen,* 224 S.W.2d at 1013[7]; *Frazier v. Shantz Real Estate & Investment Co.,* 343 Mo. 861, 874, 123 S.W.2d 124, 131–32[7] (1938). In that regard, the evidence showed the triangle is hilly, rough and unsuitable for cultivation. Its uses are limited to pasture, timber and recreation.

▆ Viewing the evidence favorably to the result below, we hold the trial court could have properly found that (a) John and Opal Magill pastured cattle on the triangle each year from 1936 or 1937 until John's death in 1961, (b) Opal, with John's help, did maintenance work on the north-south fence during the years they pastured cattle on the triangle, (c) the Magill brothers allowed the marketable timber on the triangle to be harvested in 1936 or 1937, (d) John and Opal, with the consent of John's brothers, tore down the clubhouse on the triangle in 1936 or 1937 and rebuilt it at another location, (e) John and Opal hunted and fished on the triangle from 1936 to 1961, and (f) no one else, including the Elliotts, engaged in any activities on the triangle from 1936 until Farrington put cattle on the triangle after he and Curtis built the 1978 fence. True, appellants presented evidence to the contrary; however, where there is a conflict in the evidence in a court-tried case, the trial court has the prerogative to determine the credibility of the witnesses, accepting or rejecting all, part or none of the testimony. *Trunko v. Trunko,* 642 S.W.2d 673, 674–75[2] (Mo.App.1982); *Prudential Property & Casualty Ins. Co. Inc. v. Cole,* 586 S.W.2d 433, 434[3] (Mo.App.1979).

▆ Two relevant concepts in determining whether a claimant has established actual possession of the land claimed are his present ability to control the land and his intent to exclude others from such control. *Hamburg Realty Company v. Walker,* 327 S.W.2d 155, 158 (Mo.1959); *Teson,* 561 S.W.2d at 126[6]. Given the location and character of the triangle, and the few uses for which it is suitable, we believe the activities of the Magills from 1936 until 1961 amply demonstrated their ability to control the triangle and their intent to exclude others from such control. We recognize that pasturing cattle does not in itself establish adverse possession, but it does tend to show claim of ownership. *Miller v. Warner,* 433 S.W.2d 259, 264[5] (Mo.1968); *Dambach v. James,* 587 S.W.2d 640, 643[5] (Mo.App.1979). Moreover, from 1936 until 1961, the Magills did more on the triangle than just pasture cattle. They repaired the north-south fence when necessary, allowed the marketable timber to be harvested on one occasion, dismantled and moved the clubhouse, hunted and fished.

We are aware that virtually all of the Magill activity on the triangle from 1936 until 1961 was by John and Opal, and that except for consenting to the removal of the clubhouse and to the harvesting of timber, the only connection that John's brothers had with the triangle was the occasional pasturing of their cattle under the care of John and Opal. In our view, however, that

makes no difference. It has been held that if one cotenant in possession of a jointly owned tract occupies and claims as part of that tract an adjoining parcel, his adverse possession of the latter parcel must be deemed to be possession of all of the cotenants. *Big Run Coal and Clay Co. v. Helton*, 323 S.W.2d 855 (Ky.1959). John Magill was, of course, a cotenant with his brothers of lot 4, which adjoined the triangle. John, along with Opal, was in possession of lot 4. John and Opal believed the triangle was Magill property, and used it as if it were. Accordingly, we hold the evidence sufficient to establish that from 1936 until the deed to John and Opal in 1960, the Magill brothers, by virtue of the activities of John and Opal, were in actual possession of the triangle. Additionally, we hold that after lot 4 was deeded to John and Opal in 1960, John and Opal remained in actual possession of the triangle until Opal removed their cattle following John's death in 1961.

We do not believe the evidence is sufficient to support a finding that Opal Magill was in actual possession of the triangle during the 10 years between John's death and the 1971 tax sale to respondents. At most, the evidence showed Opal was there only a half dozen times; she made no use of the triangle during those years. We likewise do not believe the evidence is sufficient to support a finding that respondents were in actual possession of the triangle after the tax sale. At most, the evidence showed Ernest West bulldozed the road to the clubhouse site in 1972 and again in 1976, camped on the triangle a few times and cut firewood on a few occasions. He did not pasture cattle on the triangle or otherwise use it, and except for one instance, did no maintenance on the north-south fence. However, for reasons that appear *infra*, the absence of actual possession by Opal Magill from John's death until the tax sale, and the absence of actual possession by respondents thereafter, is not fatal to respondents' claim.

■ The second element of adverse possession is hostile possession, that is, under a claim of right. Such possession is opposed and antagonistic to the claims of all others; it imports the occupation of land by the possessor with the intent to possess the land as his own. *Walker*, 509 S.W.2d at 106[3]; *Gates v. Roberts*, 350 S.W.2d 729, 732[3] (Mo.1961). We hold the trial court could have properly found that from 1936 until the deed to John and Opal in 1960, the Magill brothers believed they owned the triangle, that their possession (exercised through John and Opal) was opposed and antagonistic to the claims of all others, and that their occupation was accompanied by intent to possess the land as their own. The same is true of the possession by John and Opal during the interval between the 1960 deed and John's death in 1961.

Inasmuch as we have held the evidence insufficient to support a finding that Opal Magill was in actual possession of the triangle after John's death, and likewise insufficient to support a finding that respondents were in actual possession of the triangle after the 1971 tax sale, we need not consider the element of hostile possession—or any other element of adverse possession—after John's death.

■ The third element is possession that is open and notorious. Openness and notoriety of the occupancy or possession gives the owner cause to know that an adverse claim of ownership is being made by another. *Porter*, 592 S.W.2d at 849[4]. Where, as here, actual knowledge of the record owner is not proved, the claimant must show an occupancy so obvious and well recognized as to be inconsistent with and injurious to the owner's rights that the law will authorize a presumption from the facts that he had such knowledge. *Burnside v. Doolittle*, 324 Mo. 722, 731–32, 24 S.W.2d 1011, 1016[6] (1930); *Teson*, 561 S.W.2d at 127[21].

In that regard, Ernest West was not the only person who saw the Magill cattle on the triangle. The witness who hunted on the triangle from 1953 to 1980 recalled seeing the Magill cattle before 1960. This witness testified he had John Magill's permission to hunt on the triangle. Addition-

ally, a man who moved onto lot 5 in 1965 testified that the general reputation in the area as to the boundary line between the Magill land and the Elliott land was that the north-south fence was the dividing line, and that the triangle belonged to the Magills.

Furthermore, Farrington Elliott had owned cattle since 1926, and he pastured them on lot 8 just east of the triangle. He also testified he maintained the north-south fence "whenever it needed it." The trial court could reasonably infer from this evidence that Farrington Elliott was aware of the presence of the Magill cattle on the triangle during the 24 or 25 years they pastured there.

We hold there was sufficient evidence to support a finding by the trial court that the Magills' possession of the triangle from 1936 until 1961 was open and notorious.

▪ The fourth element is possession that is exclusive. This requires only that the claimant occupy the land for his own use and not for that of another. *Walker,* 509 S.W.2d at 106[2]; *Teson,* 561 S.W.2d at 127[22]. The fifth element is possession that is continuous, i.e., without lapse, for the entire statutory period. *Allen,* 224 S.W.2d at 1012–13[6]; *Teson,* 561 S.W.2d at 127. Without repeating the evidence, we hold it sufficient to support a finding that the Magill brothers' possession of the triangle from 1936 until the 1960 deed to John and Opal was exclusively for their use, and not for the use of anyone else, and that their possession of the triangle during that period was continuous and unbroken. The evidence is likewise sufficient to support a finding that the possession of the triangle by John and Opal after the 1960 deed until John's death was exclusively for their use, and not for that of anyone else, and that their possession of the triangle during that period was continuous and unbroken.

▪ We therefore hold the trial court could have properly concluded that when John Magill's brothers and their wives deeded their interests in lot 4 to John and Opal in 1960, the four Magill brothers

had been in adverse possession of the triangle continuously for a period of at least 24 years. In Missouri, two or more persons may acquire title to the same property by adverse possession as cotenants if they have exclusive joint possession for the statutory period. *Teson,* 561 S.W.2d at 127[24]. Accordingly, the trial court could have properly determined that by 1960, Farrington Elliott's title to the triangle had been extinguished by the adverse possession of the Magill brothers, and that a new title to the triangle had arisen in them. *Crane,* 436 S.W.2d at 743[3].

Inasmuch as the triangle was not included in the legal description in the 1960 deed that John and Opal received from John's brothers and their wives, we must next determine whether the interests of John's brothers in the triangle, together with the marital interests of their respective wives, passed to John and Opal by operation of law at that time.

▪ It has been held that where parties acquire title by adverse possession to land adjoining land to which they hold record title, and they thereafter convey the latter, intending to vest title to both tracts in their grantee, and the grantee takes possession of the tract adversely held, ownership thereof is transferred to the grantee. *Porter,* 592 S.W.2d at 853[18]. This is so even though the grantors have not had title quieted in them prior to the conveyance. *Id.* at 851.

▪ The evidence is sufficient to support a finding that at the time of the 1960 deed, John's brothers and their respective wives intended that the triangle be included in the land conveyed to John and Opal by that deed. After that conveyance, John and Opal remained in possession of the triangle until John died. Accordingly, we hold that the 1960 deed transferred to John and Opal, as tenants by the entirety, the aggregate of the ownership interests that John's brothers had acquired in the triangle by adverse possession, together with the respective marital interests of the brothers' wives therein. *Nelson v. Hotchkiss,* 601 S.W.2d 14, 21[14] (Mo. banc 1980).

The result was that after the 1960 deed, (a) John and Opal owned, as tenants by the entirety, the undivided ownership interests in the triangle that John's brothers had acquired by adverse possession, and (b) John continued to own his own undivided interest in the triangle that had been acquired by adverse possession, subject, of course, to Opal's marital rights.

When John died in 1961, Opal, as surviving entireties tenant, became sole owner of the interests in the triangle that she and John had acquired by the 1960 deed from John's brothers and their wives. *Nelson,* 601 S.W.2d at 19, 20[8]. Opal, as John's surviving spouse, may also have become entitled, by succession, to part or all of the interest that John had acquired in the triangle through his joint adverse possession with his brothers, however we cannot make any determination about that on this record.

We next consider whether Opal's interest in the triangle was impaired after John's death because Opal did not remain in actual possession. We conclude it was not. Having become owner, alone, of the interests in the triangle that she and John had received as entireties tenants under the 1960 deed (and also, perhaps, part or all of John's interest as his surviving spouse), Opal could be divested thereof only by adverse possession of another for the required statutory period. *Klaar v. Lemperis,* 303 S.W.2d 55, 58[6] (Mo.1957); *Porter,* 592 S.W.2d at 851[17]. There is no evidence to support a finding that Farrington Elliott, or anyone else, acquired any interest in the triangle by adverse possession after Farrington's title was extinguished by the adverse possession of the Magill brothers. Accordingly, we hold that Opal's interest in the triangle was intact at the time of her deed to respondents in 1971.

The legal description of the triangle, of course, was not included in the tax deed that conveyed lot 4 to respondents, nor was it included in Opal's deed to respondents. Consequently, we must determine whether Opal's deed to respondents conveyed her interest in the triangle to them by operation of law.

That issue was presented in *Crane,* 436 S.W.2d 739. There, a grantee's predecessors in title had acquired ownership by adverse possession of a parcel of land adjoining the tract described in the deed to the grantee. The parties believed the former parcel was included in the description in the deed, and they intended that the deed pass title to the whole to the grantee. The grantee took possession and, three years later, using the same description and intending to convey the whole, deeded the property to a church. The Supreme Court held that the church received not only the title to the described tract, but also the title to the parcel that had been acquired by the adverse possession of the predecessors in title to the church's grantor.

Here, there is evidence to support a finding that at the time of Opal's 1971 deed to respondents, Opal believed the triangle was part of lot 4, and that she intended the triangle to be included in the land she deeded to respondents. The evidence is likewise sufficient to support a finding that respondents believed the land they acquired from Opal included the triangle. After that transaction, respondents manifested their claim of ownership of the triangle by twice bulldozing the road to the old clubhouse site, hunting and camping, cutting firewood, repairing the north-south fence on one occasion, and cutting the 1978 fence.

We therefore hold that Opal's deed to respondents conveyed, by operation of law, the ownership interests in the triangle that she and John had acquired as entireties tenants by the 1960 deed from John's brothers and their wives. Opal's deed to respondents likewise conveyed such part, if any, of John's interest in the triangle that Opal had succeeded to as John's surviving spouse.

For reasons already stated, we cannot determine what fraction of the fee interest in the triangle that Opal owned at the time of her 1971 deed to respondents. That

uncertainty, however, does not mean that appellants should prevail.

A party in a quiet title action is not required to show a good title against the whole world, but only a title superior to that of the opposing party. *Love v. Missouri Union Presbytery,* 534 S.W.2d 511, 515[6] (Mo.App.1976); *Moise v. Robinson,* 533 S.W.2d 234, 240[3] (Mo.App.1975).

Here, respondents have owned some portion, and possibly even all, of the fee simple interest in the triangle since Opal's deed to them in 1971. Appellants, because of the extinguishment of Farrington Elliott's title by the adverse possession of the Magill brothers, have no interest in the triangle. Accordingly, the possibility that someone other than Opal may have succeeded to part, or all, of John's interest in the triangle upon his death does not aid appellants.

We have concluded, however, that the judgment should be modified. It declares, among other things, that respondents are vested with fee simple title to the triangle. Inasmuch as we have been unable to determine whether Opal Magill owned the entire fee interest prior to her deed to respondents in 1971, we hold that the judgment should be amended to provide that immediately prior to the 1960 deed to John and Opal, ownership of the triangle was vested in John and his three brothers in fee simple absolute, that the 1960 deed conveyed to John and Opal, as tenants by the entirety, the ownership interests in the triangle held by John's three brothers, together with the marital interests of their respective wives, that Opal became sole owner of those interests as surviving entireties tenant when John died in 1961, that Opal also became vested at that time with such part of John's fee interest in the triangle as she succeeded to as his surviving spouse, that Opal retained those interests until her 1971 deed to respondents, that all of Opal's right, title and interest in the triangle was conveyed to respondents by the 1971 deed, and that respondents are vested with such of the fee simple interest in the triangle as Opal owned immediately prior to that deed.

The judgment may also need to be amended with respect to the legal description of the triangle. Guidance regarding that will be included in our mandate.

The judgment, as modified with respect to respondents' interest in the triangle, is affirmed, and the cause is remanded for the purpose of that modification, and for the further purpose of amending the legal description of the triangle, if necessary.

GREENE, C.J., and FLANIGAN, MAUS and PREWITT, JJ., concur.